STATE OF NEBRASKA, APPELLEE, V.
RUSSELL W. HARMS, APPELLANT.
650 N.W.2d 481

Filed September 13, 2002.   No. S-00-1157.

James R. Mowbray and Robert W. Kortus, of the Nebraska Commission on Public Advocacy, for appellant.

Don Stenberg, Attorney General, and Marilyn B. Hutchinson for appellee.

HENDRY, C.J., WRIGHT, CONNOLLY, GERRARD, STEPHAN, McCORMACK, and MILLER-LERMAN, JJ.

PER CURIAM.

This matter is before us on the motion for rehearing of the appellant, Russell W. Harms, regarding our opinion reported at *State v. Harms*, 263 Neb. 814, 643 N.W.2d 359 (2002). Harms claims, in seeking rehearing, that we applied an incorrect standard of review in analyzing whether the erroneous admission of certain testimony relating to his post-*Miranda* request for an attorney and post-*Miranda* refusal to speak to a police officer was harmless beyond a reasonable doubt. We overrule the motion for rehearing, but substitute for the present analysis following the subheading "3. HARMLESS ERROR," *id.* at 831-37, 643 N.W.2d at 375-78, the following language:

Having determined that portions of the testimony of Dr. Sanat Roy and Officer Daniel White were improperly admitted pursuant to *Wainwright v. Greenfield*, 474 U.S. 284, 106 S. Ct. 634, 88 L. Ed. 2d 623 (1986), the issue becomes whether the erroneously admitted evidence is harmless. In this court's prior cases analyzing *Doyle v. Ohio*, 426 U.S. 610, 96 S. Ct. 2240, 49 L. Ed. 2d 91 (1976), we have stated that " '[b]ecause the nature of a *Doyle* error is so egregious and so inherently prejudicial, reversal is the norm rather than the exception.' " *State v. Lofquest*, 227 Neb. 567, 571, 418 N.W.2d 595, 597 (1988), quoting *Williams v. Zahradnick*, 632 F.2d 353 (4th Cir. 1980). However, *Doyle* and *Wainwright* violations constitute "trial error" and are subject to a harmless error analysis. *Brecht v. Abrahamson*, 507 U.S. 619, 113 S. Ct. 1710, 123 L. Ed. 2d 353 (1993). See, also, *Lofquest*, 227 Neb. at 570-71, 418 N.W.2d at 597 (applying " ' "harmless beyond a reasonable doubt" standard to *Doyle* violations' ").

Generally, " 'erroneous admission of evidence is harmless error and does not require reversal if the evidence is cumulative and other relevant evidence, properly admitted, supports the finding by the trier of fact.' " *State v. Ildefonso*, 262 Neb. 672, 686, 634 N.W.2d 252, 265 (2001). At Harms' trial, the trier of fact was the district court. In such a context, this court has stated:

> In a bench trial of a law action, including a criminal case tried without a jury, erroneous admission of evidence is not reversible error if other relevant evidence, admitted without objection or properly admitted over objection, sustains the trial court's factual findings necessary for the judgment or decision reviewed; therefore, an appellant must show that the trial court actually made a factual determination, or otherwise resolved a factual issue or question, through the use of erroneously admitted evidence in a case tried without a jury.

*State v. Lara*, 258 Neb. 996, 1002, 607 N.W.2d 487, 491-92 (2000). We explained in *Lara* that the burden rests on the appellant in a bench trial because of the "presumption" that the trial court, sitting as the fact finder, disregards inadmissible evidence. See *State v. Lomack*, 239 Neb. 368, 476 N.W.2d 237 (1991). Our examination of the evidence and the district court's findings are in accordance with these standards.

We begin our analysis by examining those portions of the testimony of Dr. Roy and White that were inadmissible pursuant to *Wainwright v. Greenfield*, 474 U.S. 284, 106 S. Ct. 634, 88 L. Ed. 2d 623 (1986). Dr. Roy's testimony that "when [Harms] was explained his Miranda rights, he said, 'I'm not going to talk without my lawyer,' " is essentially identical to the statement in Dr. Roy's written evaluation, admitted without objection, that "Mr. Harms refused to talk to the police officer without the present [sic] of his lawyer." Accordingly, we find Dr. Roy's testimony cumulative. Similarly, White's testimony regarding Harms' post-*Miranda* requests for counsel and failure to mention anything about hearing voices or having hallucinations is repeated without objection in Adams' testimony, which provides virtually the same answers to the same questions posed by the State. Because of this repetition, we also find White's testimony cumulative. Thus, the evidence properly considered by the trial court contained exactly the same evidence that was improperly before the court.

In addition, although Harms argues to the contrary, the record does not indicate that the district court relied upon the inadmissible evidence. The district court in its findings does not refer to Harms' post-*Miranda* silence, either as a basis for its finding of sanity or for any other purpose. The court stated:

> There's two elements in the insanity defense, and one being that defendant had a mental disease, defect, disorder at the time that the act is charged. Again, the State concedes that, at least as to this part of the defense, the defendant has that particular disorder. That would be the schizophrenia of paranoid type.
>
> We get into the next part of that and that is that— and which means not only do you have to prove that the person has that particular disease, but the defense must also show that the mental disease, the paranoid schizophrenia impaired his mental capacity to such an extent that either (1) he did not understand the nature or consequences of what he was doing or (2) that he did not know that— he did not know the difference between right or wrong with respect to what he was doing.

Now, either one of those has to be proved by the greater weight of the evidence. And if that's the case, the defense has met their burden of proving by preponderance of the evidence that he was insane. Like most of these cases, you have two experts with credentials coming into this room and they both give opposite opinions. And, of course, it has to be confusing to the lay witnesses from the standpoint that how two professionals can come up with two different types of opinion. On the other hand, I think it's pointed out by [defense counsel], his expert relied heavily— remember there was actually— well, they talked about four particular phases which didn't include the interview but they talked about his history prior to the actual incident and then the actions thereafter as part of the mix in making their determination regarding his— the issue of his knowing the nature and consequences of what he was doing or the difference between right and wrong.

Again, I know that Dr. Logan emphasized strongly the historical pattern up to the shooting which would leave a basis for his opinion as to the actual, you know, state of mind of the defendant at the time of the shooting. Now, we know the actions of the defendant at the time based on the evidence that's been submitted. And we don't know what was going on in his mind and that's the problem the Court has. Okay, we've got— somebody's got to make a decision as to what was going on in his mind at the time. We know his actions thereafter and, of course we know the cliches are brought about because they're generally there for all of us to hear, like the cliche actions speak louder than words. What he did do at the time, what he did do thereafter and, of course, [defense counsel] is saying what have we also got in the beginning of this, also to look from the standpoint of his actions, Judge, also to consider it.

There's no question that he did have a history of some delusions. And it seems like the historical pattern— now [defense counsel]'s explaining the reason and maybe given the facts and reason, he didn't— Well, let me go back here. The historical pattern seems to suggest that when Mr. Harms had a problem and felt a— whatever he called that,

anxiety coming on, he usually was able to control it to some extent and maybe it was his own feeling that the mental professionals had let him down, to not help himself any further, I don't know.

But it seems like from the history that was given, that throughout that history he was constantly telling them that he had these hallucinations or delusions and yet what I note in this particular case is, is that even Dr. Logan testified that there were no command voices that he was given at the time of the incident. And yet he, for whatever reason, he said he didn't know whether— said he believed he was— he said he was guarded. One's left to speculate as to what was going on in his mind. It's odd to me that the person that's been able to talk about all these voices all of a sudden, you know, does not— clams up when it comes to a particular factual pattern that's now very serious now confronting him.

Even after time passes he's not communicating that at least to the satisfaction of the doctor. I know that Dr. Roy on the other hand disregarded the historical context and didn't put as much weight on it and put more weight on the actual incident and he weighed also, I'm sure, his actions thereafter.

To be quite honest with both parties, it's the Court's opinion that both these professionals have left me with a lot more questions than I have answers for. And I guess what I'm saying to the defendant is that I do not believe you met your burden you have of proving yourself insane even by the greater weight of the evidence.

There is no other indication in the record that the court specifically relied upon the inadmissible evidence.

Moreover, the State offered a substantial amount of evidence regarding Harms' sanity at trial. Several individuals testified to Harms' calm demeanor immediately after the shooting. Shawn Clark, an eyewitness to the shooting, stated that Harms drove away after the shooting at a normal rate of speed and was "[n]ot [in] a real big hurry." Kenneth Hatten, another eyewitness, also testified that Harms did not hurry to leave the area after shooting Tennyson Kelsay, but, rather, drove away "[s]low, deliberate, like watching." Both White and Eric Adams, the police officers,

described how Harms behaved calmly, normally, and without agitation at the time of his arrest. Adams specifically noted that Harms' "normal" demeanor on the day of the shooting differed significantly from an angry encounter Adams had had with Harms in 1994. Holly Plager, a dispatcher for the Nemaha County Sheriff's Department, discussed how Harms was not excited or agitated when she spoke with him after the shooting and how he had asked for his attorney without any mention of hallucinations or command voices.

Dr. Roy's statements at trial and in his written evaluation of Harms, excluding inadmissible portions in violation of *Wainwright v. Greenfield*, 474 U.S. 284, 106 S. Ct. 634, 88 L. Ed. 2d 623 (1986), also provided the court with evidence of Harms' sanity at the time of the shooting. Dr. Roy found that Harms' thoughts prior to the shooting, such as " 'this old guy looks like he had a lot of good years,' " were distinguishable from command voices ordering Harms to kill someone. He testified that when he interviewed Harms, Harms denied "any auditory hallucination, delusional thinking, or any paranoia related to" Kelsay because "he has no connection with that man." Dr. Roy also compared the behavior of someone who was actively hallucinating with Harms' behavior on the day of the shooting. Dr. Roy testified that an individual in Harms' circumstance who was actively hallucinating or experiencing delusions would have exhibited "bizarre" behavior, such as engaging in a random shooting spree with multiple victims or driving at an extremely high rate of speed, and would have been incapable of acting rationally. Dr. Roy contrasted this scenario with Harms' actions, specifically, Harms' ability to slowly drive to his trailer, pick up the telephone, dial 911, speak with the dispatcher, and ask the dispatcher for his attorney. In sum, Dr. Roy testified that a person who was actively hallucinating could not have behaved the way Harms did after the shooting. Dr. Roy further testified that Harms' call to the dispatcher with a request for his attorney demonstrated that Harms knew that shooting Kelsay was wrong and would subject him to legal proceedings.

Portions of the testimony offered by Dr. William Logan, Harms' expert witness, also support a finding of sanity. Dr. Logan stated that Harms, in shooting Kelsay, "knew he was firing a gun," "knew he was shooting an elderly gentleman," and was acting

with deliberation and premeditation "[t]o the extent that he had to take out a rifle and shoot him numerous times." Dr. Logan also concluded that Harms "knew what he was doing" and "certainly knew the number he was dialing" when he called 911 with a request for his attorney.

While we recognize that Harms also presented considerable evidence at trial on the issue of his sanity, based upon the cumulative nature of the inadmissible evidence, the court's articulated findings, and the admissible evidence evaluated as a whole, we determine that Harms has failed to establish that the district court resolved the factual issue of his sanity through the use of the erroneously admitted evidence. For these reasons, we determine that the *Wainwright* errors which occurred at trial were harmless beyond a reasonable doubt.

FORMER OPINION MODIFIED.
MOTION FOR REHEARING OVERRULED.