STATE OF NEBRASKA, APPELLEE, V.
TYLER J. KEUP, APPELLANT.
655 N.W.2d 25

Filed January 10, 2003. No. S-01-758.

Robert P. Lindemeier, Lincoln County Public Defender, for appellant.

Don Stenberg, Attorney General, and Kimberly A. Klein for appellee.

HENDRY, C.J., WRIGHT, CONNOLLY, GERRARD, STEPHAN, McCORMACK, and MILLER-LERMAN, JJ.

GERRARD, J.

## PROCEDURAL BACKGROUND

The defendant, Tyler J. Keup, was charged by complaint on August 8, 2000, with first degree murder, use of a firearm to commit a felony, and being a felon in possession of a firearm, in connection with the shooting death of Maricela Martinez. Keup waived a preliminary hearing and was bound over to the district court. An information was filed charging Keup with the offenses listed above, and on September 18, Keup entered a plea of not guilty. On January 16, 2001, Keup waived his right to a jury trial.

On February 16, 2001, Keup filed a pretrial motion to suppress evidence seized from Keup's home allegedly in violation of Keup's Fourth Amendment rights. As pertinent to this appeal, Keup sought to suppress a spiral notebook containing a "letter" written by Keup that described one version of the circumstances of Martinez' death. The district court overruled Keup's motion to suppress on February 27, based on the district court's conclusion that the notebook was in plain view when examined and seized. The facts relating to Keup's motion to suppress will be discussed in more detail below.

The case was tried to the court on February 27, 2001. Keup renewed his motion to suppress with a timely objection to the offer into evidence of the notebook. After the close of all the

evidence, Keup filed a motion to dismiss the charge of first degree murder, which was granted by the district court because there was no evidence of premeditation. The district court indicated, however, that it would consider lesser-included offenses of first degree murder. Keup and the State made closing arguments, during which Keup argued that the evidence did not prove beyond a reasonable doubt that Keup acted intentionally and that Keup should be convicted only of the lesser-included offense of manslaughter. At no point did Keup object to the court's consideration of lesser-included offenses.

The district court found Keup guilty of second degree murder, use of a weapon to commit a felony, and being a felon in possession of a firearm. Keup was sentenced to 25 to 50 years' imprisonment for second degree murder, 5 to 10 years' imprisonment for the use of a firearm to commit a felony, and 1 to 3 years' imprisonment for being a felon in possession of a firearm; the latter two terms of imprisonment were to run concurrently, and the second term of imprisonment was to run consecutively to the first. Keup appeals.

## FACTUAL BACKGROUND

In June or July 2000, Keup told a friend, Michael L., that Keup wanted a handgun. Michael stole a ".25 millimeter semiautomatic handgun" in a burglary, and on August 3, Michael sold the gun to Keup for $72. Keup later showed the gun to two of his friends. Keup told them that Keup intended to scare a person who had "ripped [Keup] off" in a drug-related transaction.

On August 4, 2000, Keup telephoned Martinez and tried to arrange the purchase of drugs. Tanya Lynn Barnett, Martinez' roommate, told Martinez to call Keup back so that they could "rip him off," meaning that they would take Keup's money but not provide drugs. Barnett then left the residence to go shopping. Keup went to Martinez' residence while Barnett was gone.

Keup took the gun with him when he went to Martinez' residence. Keup testified that he had no plan or intent to shoot Martinez and that he took the gun in order to trade or sell it to get drugs. Keup testified at trial that he and Martinez were playing with the gun by pointing it at each other and, in jest, threatening to fire. Keup's testimony at trial was that although he

knew the gun was loaded, he thought the safety was on, and was pointing the gun at Martinez' head with his finger on the trigger and the hammer pulled back when the gun just "went off."

Sgt. Mark F. Bohaty, an expert from the Nebraska State Patrol Criminalistics Laboratory, testified that he later tested the weapon and was unable to induce an accidental discharge. Bohaty also testified that he conducted a "trigger-pull test," intended to determine how much force could be applied to the trigger of the gun before the gun would fire. Bohaty testified that between 4 and 5.25 pounds would need to be applied, depending on which part of the trigger was pressed, before the trigger would activate. This was well above the industry standard of 3 pounds.

Keup testified that after the shooting, he grabbed his cigarettes, fled Martinez' residence, and went home, where, because he was scared, he lied to his parents and said that he had seen Martinez commit suicide. Additionally, Barnett testified that after she returned home, she noticed that Keup's telephone number had been erased from the caller identification device at Martinez' residence, although she and Martinez never erased telephone numbers from the device and all of the other calls remained in the device's memory.

When Barnett returned home, she called the 911 emergency dispatch service. Police responded and found Martinez dead, seated on her couch, with an apparent wound to the right temple. A single, small-caliber firearm casing was found on the floor 2 to 3 feet from Martinez' body. Martinez was taken to the hospital and was determined to have suffered a single gunshot wound to the head. It was determined, based on the bullet path and nature of the wound, that the gun was between 1 and 2 inches from Martinez' head when discharged.

Lt. Rick Ryan, of the North Platte Police Department, was at the hospital following Martinez' transport there, when he received a telephone call from Keup's father. Keup's father said that Keup had witnessed a suicide. Ryan met with Keup and Keup's parents at the police station. Keup's father brought a small handgun that had been given to him by Keup. This gun was later identified as the gun sold to Keup by Michael and was also determined to have discharged the shell casing that was found near Martinez' body.

Keup and his parents were read their *Miranda* rights and waived those rights and agreed to speak to Ryan. Keup stated to Ryan that Keup had telephoned Martinez and gone to Martinez' residence to retrieve some personal belongings. Keup told Ryan that Martinez had produced the gun, that Keup had handled it and given it back to Martinez, and that then, while Keup was looking away, the gun went off. Keup claimed to Ryan that because Keup was a convicted felon and Keup's fingerprints were on the gun, Keup took the gun and fled the scene.

Ryan asked Keup to take a polygraph examination, which was administered by Investigator Randy Billingsley of the North Platte Police Department. Based on the examination, Billingsley told Keup that Keup was being untruthful. The results of the polygraph examination were admitted into evidence at trial only as foundation for Keup's ensuing statements to Billingsley. When accused by Billingsley, Keup broke down and admitted that he had shot Martinez. Keup still claimed that the gun was Martinez' and that Keup had unloaded it and was playing with it when it went off. At trial, Keup admitted lying to both Ryan and Billingsley.

Investigator Matt Phillips of the North Platte Police Department testified that he was required to collect evidence of physical characteristics from Keup, including hair, blood, and urine samples. During these procedures, Keup asked if the judge would see the results of Keup's blood tests for drugs and alcohol. Phillips replied that the judge probably would see those test results. According to Phillips, Keup replied, " 'Good, because there was nobody present when I shot her, and the only witnesses were those outside when I left.' "

Phillips also testified regarding the execution of a search warrant at Keup's residence on August 5, 2000. The search warrant described the items to be found, generally, as .25-caliber ammunition, the clothing and sunglasses worn by Keup at the time of the shooting, and the bicycle Keup used as transportation to and from Martinez' residence.

Phillips was searching the basement of the Keup residence looking for .25-caliber ammunition, which he described as being about one-half inch long and one-quarter inch wide. While searching the basement, Phillips saw a spiral notebook

"[l]aying in plain view on a shelf" about 2 to 3 feet off the ground. Phillips lifted the notebook up and saw that the page to which the notebook was open had text written on it that related to the death of Martinez, so Phillips seized the notebook. Phillips testified that he picked the notebook up and began reading it after he saw some of the words written on the top page.

The record contains a photograph taken at the scene of the notebook as it appeared when it was found, which indicates that the top page of writing was visible and legible to anyone in a position to look at the shelf. The page to which the notebook was open contains text that clearly relates to the death of Martinez. The writing begins "Dear Lord, I am afraid and scared" and sets forth a version of events that generally corresponds to the statement Keup made to Ryan, but later repudiated. At trial, Keup acknowledged the writing and claimed that he wrote it because he was "just trying to fool myself."

The primary issue contested at trial was whether the gun fired accidentally or Keup fired the gun intentionally. After the close of the evidence and closing arguments, the district court concluded that Keup had pulled the trigger and fired the weapon intentionally, and was guilty of second degree murder.

## ASSIGNMENTS OF ERROR

Keup assigns, restated, that the district court erred in (1) overruling his motion to suppress when the notebook was outside the scope of the warrant, no probable cause existed for the seizure, and the notebook was not in plain view; (2) finding Keup guilty of second degree murder when the specific findings by the district court are contradictory and confusing, indicating an erroneous application of the law and facts with regard to the element of intent; and (3) finding Keup guilty of second degree murder as a lesser-included offense of first degree murder, without jurisdiction and in violation of Keup's right to due process, because (a) second degree murder is not a lesser-included offense of first degree murder and (b) Keup was acquitted of second degree murder when the district court dismissed the charge of first degree murder.

## STANDARD OF REVIEW

In reviewing a district court's ruling on a motion to suppress evidence obtained through a warrantless search or seizure,

an appellate court conducts a de novo review of reasonable suspicion and probable cause determinations, and reviews factual findings for clear error, giving due weight to the inferences drawn from those facts by the trial judge. *State v. Roberts*, 261 Neb. 403, 623 N.W.2d 298 (2001).

A conviction in a bench trial of a criminal case is sustained if the properly admitted evidence, viewed and construed most favorably to the State, is sufficient to support that conviction. In making this determination, an appellate court does not resolve conflicts in evidence, pass on credibility of witnesses, evaluate explanations, or reweigh evidence presented, which are within a fact finder's province for disposition. *State v. Harms*, 263 Neb. 814, 643 N.W.2d 359 (2002), *modified on denial of rehearing* 264 Neb. 654, 650 N.W.2d 481. When reviewing a criminal conviction for sufficiency of the evidence to sustain the conviction, the relevant question for an appellate court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *State v. Jackson*, 264 Neb. 420, 648 N.W.2d 282 (2002). A trial judge is presumed in a jury-waived criminal trial to be familiar with and apply the proper rules of law, unless it clearly appears otherwise. *State v. Lyle*, 258 Neb. 263, 603 N.W.2d 24 (1999).

While in a bench trial of a criminal case the court's findings have the effect of a verdict and will not be set aside unless clearly erroneous, an appellate court has an obligation to reach an independent, correct conclusion regarding questions of law. *State v. Robbins*, 253 Neb. 146, 570 N.W.2d 185 (1997).

## ANALYSIS

### SEIZURE OF NOTEBOOK

The first issue we discuss is Phillips' seizure of Keup's notebook, which contained a "letter" written by Keup setting forth his initial, untruthful account of Martinez' death. It is not disputed that the notebook fell outside the scope of the search warrant Phillips was executing at the time he found the notebook; therefore, the subsequent seizure and search of the notebook were warrantless. The question is whether the notebook fell within the

plain view exception to the warrant requirement of the state and federal Constitutions.

 A warrantless seizure is justified under the plain view doctrine if (1) a law enforcement officer has a legal right to be in the place from which the object subject to the seizure could be plainly viewed, (2) the seized object's incriminating nature is immediately apparent, and (3) the officer has a lawful right of access to the seized object itself. *State v. Buckman*, 259 Neb. 924, 613 N.W.2d 463 (2000). In the present case, Keup admits that the search warrant gave Phillips the legal right to be in the place from which the notebook could be viewed, and Keup does not contest that Phillips had a lawful right of access to the notebook. Keup contends that the plain view exception does not apply because the incriminating nature of the notebook was not immediately apparent.

 For an object's incriminating nature to be immediately apparent, the officer must have probable cause to associate the property with criminal activity. See *Brayman v. U.S.*, 96 F.3d 1061 (8th Cir. 1996). A seizure of property that is in plain view is presumptively reasonable, assuming that there is probable cause to associate the property with criminal activity. *State v. Holman*, 221 Neb. 730, 380 N.W.2d 304 (1986). Probable cause is a flexible, commonsense standard. *Id.* It merely requires that the facts available to the officer would warrant a person of reasonable caution in the belief that certain items may be contraband or stolen property or useful as evidence of a crime; it does not demand any showing that such a belief be correct or more likely true than false. *Id.* A practical, nontechnical probability that incriminating evidence is involved is all that is required. *Id.* See *Texas v. Brown*, 460 U.S. 730, 103 S. Ct. 1535, 75 L. Ed. 2d 502 (1983).

In the instant case, the evidence shows that the notebook was found open and that the visible page of writing clearly related to the death of Martinez. Little more than a cursory glance at the notebook would have been necessary to warrant a reasonable belief that the notebook could be useful as evidence of a crime. The district court's factual conclusion in that regard is not clearly wrong. Once the incriminating nature of the notebook was established, Phillips had probable cause to seize the notebook.

Keup argues that the incriminating nature of the notebook was not immediately apparent because the notebook had to be read before its contents were known. This argument is without merit. Courts have generally held that the incriminating nature of written material is immediately apparent even if the material must be read in order to discern its content. See, e.g., *United States v. Crouch*, 648 F.2d 932 (4th Cir. 1981); *United States v. Ochs*, 595 F.2d 1247 (2d Cir. 1979); *Mapp v. Warden, N.Y. State Corr. Inst., Etc.*, 531 F.2d 1167 (2d Cir. 1976); *U.S. v. Small*, 664 F. Supp. 1357 (N.D. Cal. 1987); *Commonwealth v. D'Amour*, 428 Mass. 725, 704 N.E.2d 1166 (1999); *Daniels v. State*, 683 N.E.2d 557 (Ind. 1997); *State v. Andrei*, 574 A.2d 295 (Me. 1990); *State v. Parker*, 236 Kan. 353, 690 P.2d 1353 (1984); *People v. Dressler*, 317 Ill. App. 3d 379, 739 N.E.2d 630, 250 Ill. Dec. 867 (2000); *State v. Dobbs*, 100 N.M. 60, 665 P.2d 1151 (N.M. App. 1983). A billboard, placed by the side of a busy highway, is no less in "plain view" because passersby must read the billboard in order to determine its content. Similarly, in the instant case, the words written in the notebook were in plain view and their nature was immediately apparent, despite the fact that Phillips had to read the page in order to determine that.

Keup also argues that in order to determine whether the notebook contained any evidence of a crime, Phillips "had to read the note which this court can see is quite lengthy to determine that it was signed by [Keup] and that it referred to the crime the officer was investigating." Brief for appellant at 9. This argument is also without merit. The page to which the notebook was open, which was visible to Phillips, clearly related to the death of Martinez and afforded probable cause to seize the notebook and examine the rest of its contents. While further examination was necessary to verify that Keup had written the page that was visible, there was still a reasonable basis to associate the writing with the death of Martinez. In other words, even if the writing in the notebook had been signed by someone else, it was still immediately apparent that the writing was associated with Martinez' death.

Keup primarily relies on *Arizona v. Hicks*, 480 U.S. 321, 107 S. Ct. 1149, 94 L. Ed. 2d 347 (1987), to support his claim that the notebook was unlawfully seized. *Hicks*, however, does not

support Keup's argument. In *Hicks*, police entered an apartment after a bullet was fired through the floor of the apartment and into an apartment below. The police were searching for the shooter, weapons, and any other shooting victims. A police officer observed expensive stereo equipment and suspected it might be stolen, so the officer recorded the serial numbers of the equipment. The officer was required to move a turntable to view the serial numbers. When the equipment was determined to have been stolen, it was seized. See *id.*

The U.S. Supreme Court determined that the officer's warrantless search and seizure of the equipment did not fall within the plain view exception to the warrant requirement. The Court reasoned that the officer had conducted a search, without probable cause, by moving the turntable to view the serial numbers. However, the Court noted that the lawful objective of the officer's entry into the apartment was the search for the shooter, weapons, and any victims, and specifically stated that "[m]erely inspecting those parts of the turntable that came into view during the latter search would not have constituted an independent search, because it would have produced no additional invasion of respondent's privacy interest." 480 U.S. at 325.

In *Hicks*, the determinative fact was that the officer was required to move the equipment in order to view the serial numbers—in other words, the serial numbers were not in plain view and revealing them required a search without probable cause. See *id.* In this case, by contrast, the top page of the notebook was in plain view, and Phillips was not required to move the notebook in order to view the top page. After seeing the top page, Phillips had probable cause to seize and examine the notebook.

The district court found that the notebook was in plain view, and it was immediately apparent that the first page of the notebook was evidence concerning the crime. The district court's factual findings in that regard are supported by competent evidence and are not clearly wrong. Therefore, Keup's first assignment of error is without merit.

### ELEMENT OF INTENT

A person commits murder in the second degree if he or she causes the death of a person intentionally, but without

premeditation. Neb. Rev. Stat. § 28-304(1) (Reissue 1995). The intent to kill may be inferred, sufficient to support a murder conviction, from the defendant's deliberate use of a deadly weapon in a manner likely to cause death. *State v. Sims*, 258 Neb. 357, 603 N.W.2d 431 (1999).

Keup's argument with respect to the element of intent is somewhat perplexing. Keup's argument appears to be directed less at the sufficiency of the evidence to support a finding that Keup acted intentionally than at the district court's purportedly erroneous legal basis for that finding. Nonetheless, we note that to the extent Keup is arguing the evidence of intent was insufficient, that argument is without merit. The district court's factual finding that Keup acted intentionally is supported by competent evidence, described above, which, viewed and construed most favorably to the State, is sufficient to support the conviction. See *State v. Harms*, 263 Neb. 814, 643 N.W.2d 359 (2002), *modified on denial of rehearing* 264 Neb. 654, 650 N.W.2d 481.

Keup's primary argument seems to be that in making detailed findings of fact for the record, the district court somehow demonstrated a misunderstanding of the element of intent. A review of the district court's findings, however, reveals no error sufficient to overcome the presumption that the district court was familiar with and applied the proper rules of law. See *State v. Lyle*, 258 Neb. 263, 603 N.W.2d 24 (1999).

The district court specifically referred to and relied upon our decision in *State v. Rokus*, 240 Neb. 613, 483 N.W.2d 149 (1992). In that case, the defendant, Larry Rokus, who was eventually convicted of second degree murder, gave several conflicting versions of how the victim, Joseph Kashuba, was shot in the head at point-blank range. We summarized the interrogation of the defendant as follows:

> In the course of this interrogation, Rokus said that he had wanted to show Kashuba how to load the .44 Magnum; therefore, he placed six hollow-point bullets in the revolver's cylinder and handed the loaded revolver to Kashuba. As Rokus described the situation, after Kashuba had examined the loaded revolver, he began "handing it back to [Rokus], butt first, the barrel towards Mr. Kashuba, and the gun . . . discharged." In response to

Rokus' description of the shooting, [the interrogating officer] said that in view of the fact that the Magnum was a "wheel gun or a cylinder type revolver," [he] "had problems with that story." At that point, Rokus acknowledged that he "had lied" and that the shooting actually occurred as Rokus was demonstrating a quick draw from the shoulder holster, which he was wearing, and when Rokus "quick drawed," the revolver discharged the bullet that struck Kashuba. After additional questioning, the interrogation ended.

[Later, the interrogating officer] informed Rokus concerning Kashuba's wounds and told Rokus that the account of the shooting related by Rokus in the earlier interrogation was "not matching up" with the results of the autopsy. Rokus responded that Kashuba was killed while the pair was "playing Russian roulette." [The interrogating officer] asked how anyone could play Russian roulette with six bullets in the cylinder chambers of the fatal revolver, and Rokus answered that he and Kashuba "were simply pointing the gun at each other's heads and not pulling the trigger." Rokus then told the officers that while engaged in Russian roulette, he pointed the .44 Magnum at Kashuba, and the gun discharged. Rokus maintained that he did not intend to pull the trigger and that the shooting was an accident. Later in the course of this second interrogation, Rokus gave still another version of the shooting: Rokus, while Kashuba had his head turned away from Rokus, "took the gun out of the holster, placed it to the back of [Kashuba's] head," and said, "Surprise, mother fucker," as Rokus pulled the trigger.

*Id.* at 616-17, 483 N.W.2d at 152.

At trial, despite his earlier statements, Rokus testified that Kashuba was sitting in a chair when Rokus approached him from behind, pulled the .44 Magnum from its shoulder holster on Rokus, and then put the revolver to Kashuba's head, " 'just joking around,' " and said, " 'Surprise,' " as the gun discharged. *Id.* at 619, 483 N.W.2d at 153. Rokus had believed that the revolver was " 'unloaded' " when he put the firearm to Kashuba's head and could not recall whether the revolver had been cocked. *Id.*

On appeal, we concluded that the evidence was sufficient to support the conviction. We stated:

Circumstances surrounding the fatal shot from Rokus' revolver allow and support the inference that Rokus intended to shoot and kill Kashuba. The jury was entitled to find that Kashuba was seated in a dining room chair while Rokus was approaching from behind Kashuba. From the location of the contact wound on Kashuba's head, the jury could infer that the fatal hollow-point bullet was fired at point-blank range from the .44 Magnum's muzzle at the base of Kashuba's skull; hence, Rokus was deliberately pointing the revolver at Kashuba when the weapon discharged. None can argue that a hollow-point bullet fired from a .44 Magnum is not a life-threatening projectile. Intent to kill may be inferred from deliberate use of a deadly weapon in a manner reasonably likely to cause death.

*State v. Rokus*, 240 Neb. 613, 621-22, 483 N.W.2d 149, 154-55 (1992).

The pertinence of our decision in *Rokus* is evident, given the parallel between the issues presented in that case and the instant case. From circumstances around a defendant's voluntary and willful act, a finder of fact may infer that the defendant intended a reasonably probable result of his or her act. See *Rokus, supra*. The evidence presented in this case indicates that when the weapon was discharged, Keup was deliberately pointing the weapon at Martinez' head, at a distance of 1 to 2 inches, with his finger on the trigger and the hammer cocked. The State's firearms expert, Bohaty, testified that the trigger on the weapon required between 4 to 5.25 pounds of force before the weapon would discharge and that Bohaty was unable to induce an accidental discharge of the weapon. The evidence adequately supports the inference that Keup's firing of the weapon required a conscious and appreciable effort by Keup; thus, Keup's intent to cause Martinez' death may be inferred from the evidence. The district court's reliance on *Rokus* demonstrates that contrary to Keup's suggestion, the court correctly applied the law to the facts of the instant case with regard to the element of intent. Keup's assignment of error is without merit.

LESSER-INCLUDED OFFENSES

 Keup argues that the district court erred when, after dismissing the charge of first degree murder, the district court considered lesser-included homicide offenses. However, Keup waived any error in this regard by failing to present the issue to the district court with a timely objection. An appellate court will not consider an issue on appeal that was not presented to or passed upon by the trial court. *State v. Faber*, 264 Neb. 198, 647 N.W.2d 67 (2002).

 The record in the instant case shows that Keup never objected to the district court's consideration of lesser-included offenses. The district court dismissed the first degree murder charge prior to closing arguments, then stated that it would consider lesser-included offenses. Keup and the State then made closing arguments. Keup specifically argued that the district court should find Keup guilty only of the lesser-included offense of manslaughter. This would be a peculiar trial strategy unless Keup was aware that the district court was considering second degree murder—yet Keup failed to object throughout. With respect to jury trials, we have often stated that failure to timely object to jury instructions prohibits a party from contending on appeal that the instructions were erroneous. See, e.g., *State v. Myers*, 258 Neb. 300, 603 N.W.2d 378 (1999). Likewise, in a bench trial, the defendant must timely object to the trial court's consideration of lesser-included offenses in order to preserve that issue for appellate review.

 In the absence of plain error, when an issue is raised for the first time in an appellate court, the issue will be disregarded inasmuch as the trial court cannot commit error regarding an issue never presented and submitted for disposition in the trial court. *State v. Tyma*, 264 Neb. 712, 651 N.W.2d 582 (2002). Plain error may be asserted for the first time on appeal or be noted by the appellate court on its own motion. *State v. Nelson*, 262 Neb. 896, 636 N.W.2d 620 (2001). Plain error will be noted only where an error is evident from the record, prejudicially affects a substantial right of a litigant, and is of such a nature that to leave it uncorrected would cause a miscarriage of justice or result in damage to the integrity, reputation, and fairness of the judicial process. *Tyma, supra.*

We find no plain error in the district court's consideration of the lesser-included offense of second degree murder. In a bench trial, where the State fails to demonstrate a prima facie case on the crime charged, but does so on a lesser-included offense, the trial court may, in its discretion, dismiss the charge and consider all properly submitted evidence relative to a lesser-included offense of the crime charged in the information. See *State v. Foster*, 230 Neb. 607, 433 N.W.2d 167 (1988). We have repeatedly held that second degree murder is a lesser-included offense of first degree murder. See, *State v. McCracken*, 260 Neb. 234, 615 N.W.2d 902 (2000), *abrogated on other grounds, State v. Thomas*, 262 Neb. 985, 637 N.W.2d 632 (2002); *State v. Dixon*, 259 Neb. 976, 614 N.W.2d 288 (2000); *State v. Al-Zubaidy*, 253 Neb. 357, 570 N.W.2d 713 (1997). Thus, the district court did not commit plain error when it dismissed the first degree murder charge but considered the lesser-included offense of second degree murder. Keup also argues that he was not given notice that the State would be seeking a conviction on second degree murder, as Keup was charged only with first degree murder. However, Keup had notice that lesser-included offenses of first degree murder would be considered, pursuant to *Foster, supra.*

Finally, Keup argues that he was somehow impliedly acquitted of second degree murder when the district court dismissed the charge of first degree murder. This argument is contradicted by our holding in *State v. White*, 254 Neb. 566, 577 N.W.2d 741 (1998). In *White*, the defendant was charged with first degree murder and convicted of the lesser-included offense of second degree murder, but the second degree murder conviction was later vacated. We concluded that the conviction for second degree murder operated as an implied acquittal of first degree murder and that the Double Jeopardy Clause barred the State from retrying the defendant for the crime of first degree murder. See *White, supra.* However, we also stated that the State was not prevented from proceeding with a new trial on the vacated second degree murder conviction. See *id.* In the instant case, pursuant to *White*, the district court's dismissal of the charge of first degree murder did not acquit Keup of the lesser-included offense of second degree murder. Keup's argument provides no basis for a finding of plain error.

Keup did not make a timely objection to the district court's consideration of the lesser-included offenses to first degree murder, and the record does not show plain error. Keup's final assignment of error is without merit.

## CONCLUSION

The district court did not err in denying Keup's motion to suppress evidence. The evidence is sufficient to sustain the district court's finding that Keup acted intentionally, and the court applied the correct legal standards in reaching that conclusion. Keup did not object to the district court's consideration of lesser-included offenses and has shown no basis for finding the court's consideration of lesser-included offenses to be plain error. Because Keup's assignments of error are without merit, the judgment of the district court is affirmed.

AFFIRMED.