IN THE NEBRASKA COURT OF APPEALS

## MEMORANDUM OPINION AND JUDGMENT ON APPEAL
(Memorandum Web Opinion)

STATE V. WRIGHT

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

STATE OF NEBRASKA, APPELLEE,

V.

KYATANA J. WRIGHT, APPELLANT.

Filed May 24, 2016.    No. A-15-488.

Appeal from the District Court for Douglas County: W. RUSSELL BOWIE III, Judge. Affirmed.

Glenn A. Shapiro, of Schaefer Shapiro, L.L.P., for appellant.

Douglas J. Peterson, Attorney General, and Kimberly A. Klein, for appellee.

PIRTLE, RIEDMANN, and BISHOP, Judges.

BISHOP, Judge.

Following a bench trial, Kyatana J. Wright was convicted of knowing and intentional child abuse not resulting in serious bodily injury, a Class IIIA felony, pursuant to Neb. Rev. Stat. § 28-707(1), (4) (Cum. Supp. 2014). After the district court for Douglas County sentenced her to 18 months' probation, Wright timely appealed to this court. For the following reasons, we affirm.

BACKGROUND

On March 5, 2014, Wright was charged by information with one count of knowing and intentional child abuse resulting in serious bodily injury, a Class II felony, pursuant to § 28-707(1), (7). The victim of the alleged abuse was Wright's 2-month-old son, K.M.

Wright voluntarily waived her right to a jury trial, and a bench trial was held on February 2, 2015. The State's first witness was Dr. Suzanne Haney, a child abuse pediatrician who served as the medical director of the children's advocacy team at Children's Hospital & Medical Center

in Omaha, Nebraska, and also as the medical director of Project Harmony, a nonprofit child advocacy center. Through her position at Children's Hospital & Medical Center, she also consulted on child abuse cases at the Nebraska Medical Center in Omaha.

Dr. Haney testified as follows. She was board certified in child abuse pediatrics and had consulted on thousands of cases of suspected child abuse, hundreds of which involved abusive head trauma of some type. On January 29, 2014, she examined K.M. at the Nebraska Medical Center, after he had presented to the emergency room the prior evening with swelling of his head. K.M. had skull fractures on both sides of his head, as well as "bleeding underneath both of those areas, all around his brain." The fractures went from "the parietal bones . . . on both sides . . . down into the temporal bones." The CT scans of K.M.'s head showed that the fractures were "comminuted, which is essentially shattered," and on one side, the fracture "was mildly depressed or separated a little bit." K.M. also had bleeding in the back of his right eye, caused by a retinal hemorrhage, which "can be seen with significant blunt force trauma to the head."

According to Dr. Haney, the shattered pattern of the fractures indicated "[s]ignificant trauma," which would have required "significant force." She described the type of mechanism necessary to result in the fractures as "blunt force trauma." This meant K.M.'s head impacted "something probably flat or broad."

Dr. Haney testified that she spoke with Wright at the hospital. Wright told Dr. Haney that while caring for K.M., she left him on the couch and went to the bathroom. While in the bathroom, Wright heard K.M. crying. She came out and found K.M. on the floor, and she suspected that her 18-month-old son had pulled K.M. off of the couch. Wright indicated that it was a low couch and that the room had carpet over a concrete floor.

According to Dr. Haney, Wright's story was inconsistent with K.M.'s injuries. Falling off of a couch onto a carpeted floor would not result in the injuries K.M. sustained. Specifically, "the pattern of the skull fracture was not consistent with that type of fall." Dr. Haney had seen injuries as severe as K.M.'s injuries "with a child doing a header out of a two-story window." She also would expect to see injuries as severe as K.M.'s in a child who had been ejected from a car and had landed on his or her head, or in a child who had been slammed onto his or her head.

Wright also told Dr. Haney that sometime recently she and K.M. had been involved in a car accident. According to Dr. Haney, Wright said she "had been moving from a stopped position and hit a car . . . that was crossing in front of her." K.M. was restrained during the accident, and the airbags did not deploy. Dr. Haney indicated that none of the information that Wright provided could have accounted for K.M.'s injuries.

Dr. Haney testified that it was possible that an accident could account for the injuries K.M. sustained. Generally, Dr. Haney would rule out abuse as the cause of a child's injuries if someone gave her a history that was consistent with an accident. However, Wright did not give any history that was consistent with K.M.'s injuries. Furthermore, Wright told Dr. Haney that she was the only adult with K.M. at the time the injuries occurred.

Dr. Haney further testified that the symptoms she would expect to see for injuries like K.M.'s would be crying and screaming immediately, because "[i]t was very painful." In addition, swelling to the head could appear relatively quickly, but sometimes could take a few hours or more to show up. Because K.M. had little to no brain injury, she would not expect to see loss of

consciousness or "anything like that." When asked if it was "fair to assume that whatever mechanism was inflicted on this child was sometime close in time to the time this child began exhibiting screaming, crying, et cetera," Dr. Haney testified, "I don't know if I can say that." She explained that the onset of symptoms in relation to the infliction of trauma would depend on "what the trauma is."

On cross-examination, Dr. Haney testified that at the hospital, Wright was appropriately upset for her child and very worried. Other than the injuries Dr. Haney described on direct examination, K.M. otherwise appeared well and had no bruising on his body. K.M. had no "appearance of blunt force trauma on . . . external examination"; the only visible external sign of injury was swelling. Dr. Haney testified that the only treatment for K.M.'s injuries was close observation and pain medication. If Wright had not brought K.M. to the emergency room, his condition would have been the same, with no permanent injury.

Still on cross-examination, Dr. Haney testified that a floor could be the type of flat surface that caused blunt force trauma. Dr. Haney agreed that, although Wright told her that K.M. fell on a carpeted concrete floor, there was no mention of padding or of the thickness of the carpet. However, Dr. Haney testified that the thickness of the carpet was not an important factor in this case.

Dr. Haney responded "[p]ossibly" when asked if she had testified during a deposition that the fall could have been "from maybe four feet high." She further testified that if Wright had told her that she had fallen on top of K.M. with her body weight added, Dr. Haney would have been "fine with that." When asked if her "medical opinion would be the mechanism of injury could possibly be an accidental drop just from a higher height than the couch as told by the mother," Dr. Haney responded "[c]orrect."

On redirect examination, Dr. Haney testified that according to the medical records, Wright told the emergency room doctor that the couch off of which K.M. fell was approximately 1½ feet from the ground. Dr. Haney indicated that this was too short of a fall to "essentially shatter" K.M.'s skull. The doctor further testified that an 18-month-old child would not have the strength or coordination to climb on the couch, pick up K.M. over his head, and drop K.M. from the couch to the ground.

Dr. Haney clarified in response to one of the prosecutor's questions that her diagnosis was not "abusive head trauma" but was "blunt force trauma to the head." However, it was not the doctor's opinion that the injuries were accidental, because she was "never given that history" and "you would not expect a two-month-old to have something happen to them [sic] and nobody know."

Still on redirect, Dr. Haney was asked, "Are you able to tell us whether or not an injury would have been inflicted that same day?" Dr. Haney answered, "No, I'm not," and explained, "Sometimes it can take hours or longer for the swelling to show up. So just based on how he appeared when he showed up in the emergency room, I can't say." However, upon additional questioning about the timing of the injury, Dr. Haney testified that based on the history Wright provided, including that Wright was alerted to her child's screaming, Dr. Haney's opinion within a reasonable degree of medical certainty was that K.M.'s injuries "most likely occurred at the time that [Wright] was alerted to her child's distress."

The State's next witness was Lieutenant Jerald Swanson of the Omaha Police Department. At the time of the incident, he was a sergeant in the child victim/sexual assault unit of the criminal investigations bureau. On the evening of January 28, 2014, he responded to the Nebraska Medical Center, where he learned of K.M.'s injuries. He conducted a "basic fact-gathering" interview of Wright in a room at the hospital. Wright was not under arrest and was not given warnings pursuant to *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966), at the time.

During the interview, Wright told Lieutenant Swanson that at around 3:30 p.m., she was feeding K.M., when her boyfriend, the child's father, left to pick up Wright's oldest child from school. (The record reflects that the oldest child was 6 years old.) After her boyfriend left, Wright placed K.M. on a couch in the living room and went to use the restroom. When she was in the bathroom or returning from the bathroom, she heard K.M. crying, and she observed him on the floor in front of the couch, with her 22-month-old son standing nearby. (The record is not clear if Wright's middle son was 18 months or 22 months at the time). Wright also told Lieutenant Swanson that she and K.M. had been in a car accident 2 to 3 weeks earlier, but she denied that either of them received injuries from the accident. An audio recording of the interview was received into evidence without objection.

Lieutenant Swanson also testified that on January 29, 2014, after speaking with Dr. Haney, he conducted a formal interview of Wright at the police department's central headquarters. He gave Wright warnings pursuant to *Miranda v. Arizona, supra*, at the beginning of the interview, and she agreed to speak with Lieutenant Swanson and a detective. According to Lieutenant Swanson, Wright provided essentially the same information she had provided the day prior at the hospital. A video recording of the interview was received into evidence without objection.

During the videotaped interview, Wright recounted the events leading up to K.M.'s trip to the emergency room, beginning with the evening of January 27, 2014, which was the day prior. On the evening of January 27, she was at home with her three children, and her boyfriend was at work until 10 or 11 p.m. She recalled that K.M. went to bed around 9 p.m. in Wright's bedroom. When Wright's boyfriend arrived home, she ate dinner with him, and then she went to sleep. She woke up at approximately 4 a.m., and her boyfriend woke up around 6 or 7 a.m. Her boyfriend took the oldest child to school around 8:30 a.m.

According to Wright, K.M. woke up around the time her boyfriend left with the oldest child for school. Wright's boyfriend returned shortly after dropping off the child. He then left two other times that morning, once to buy cigarettes and once for an unknown reason, returning home each time. Throughout the day, Wright either watched television or played videogames with her boyfriend. Wright's middle child was present in the home, either playing in his room or watching television.

Wright recalled that K.M. went to sleep after she nursed him at 8:30 or 9 a.m., and he woke up again around 11 a.m. During that first nap, K.M. slept in a swing in the room where Wright was watching television. When K.M. woke up around 11 a.m., Wright nursed him again, and then K.M. fell asleep on the couch by Wright.

Wright told the lieutenant during the videotaped interview that at around 3:30 or 3:40, her boyfriend left to pick up her oldest child from school. When her boyfriend left, Wright was nursing K.M. on the couch. After finishing nursing, Wright left K.M. on the couch while she went to the

bathroom. While in the bathroom, she heard K.M. screaming, and she returned to find him on the floor in front of the couch. She believed that her middle child had pulled him off of the couch.

During the State's case, K.M.'s medical records from the Nebraska Medical Center were also received into evidence without objection. The emergency room notes entered on January 28, 2014, at 5:18 p.m. indicate that Wright reported that K.M. rolled off of a couch approximately 1½ feet high onto a thinly carpeted floor approximately 30 to 45 minutes prior to evaluation. She reported that following the fall, K.M. was alert and screaming with a lump on the back of his head.

The State rested, and Wright's counsel made an oral "motion to dismiss," arguing the State had failed to present any evidence that K.M. suffered a serious bodily injury. The court asked Wright's counsel whether there were lesser-included offenses, and counsel answered affirmatively. The court then overruled the motion, and Wright rested without offering any evidence.

At the conclusion of trial, the court took the case under advisement. On February 17, 2015, with Wright and the attorneys present in the courtroom, the court announced its verdict that Wright was guilty of knowing and intentional child abuse not resulting in serious bodily injury. The court made no other findings and entered a written judgment of conviction the same day. On May 6, the court sentenced Wright to 18 months' probation. Wright timely appealed to this court.

## ASSIGNMENTS OF ERROR

Wright assigns that the district court (1) "erroneously overruled [her] motion for a directed verdict because the evidence, even when viewed and construed most favorably to the State, did not support a finding of a prima facie case of intentional child abuse resulting in serious bodily injury," and (2) "erroneously found [her] guilty of a lesser included offense because no rational trier of fact could find that the evidence, even when viewed and construed most favorably to the State, supported a verdict of guilty beyond a reasonable doubt."

## STANDARD OF REVIEW

Regardless of whether the evidence is direct, circumstantial, or a combination thereof, and regardless of whether the issue is labeled as a failure to direct a verdict, insufficiency of the evidence, or failure to prove a prima facie case, the standard is the same: In reviewing a criminal conviction, an appellate court does not resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh the evidence; such matters are for the finder of fact, and a conviction will be affirmed, in the absence of prejudicial error, if the evidence admitted at trial, viewed and construed most favorably to the State, is sufficient to support the conviction. *State v. Cook*, 266 Neb. 465, 667 N.W.2d 201 (2003). When reviewing a criminal conviction for sufficiency of the evidence to sustain the conviction, the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *State v. Keup*, 265 Neb. 96, 655 N.W.2d 25 (2003).

## ANALYSIS

Wright's first assignment of error is that the district court erred in overruling her motion for a directed verdict at the close of the State's evidence. In support, Wright argues that "[t]he

State failed to introduce any evidence that [she] did anything intentional to cause the injury to her baby." Brief for appellant at 5. She relies upon Dr. Haney's testimony, which, according to Wright, was that "the mechanism of [K.M.'s] injury was an accidental drop from a higher height." *Id*. at 6. Based on this reading of Dr. Haney's testimony, Wright concludes that the district court should have directed a verdict in her favor.

Wright's second assignment of error is that the evidence was insufficient to support a conviction of the lesser-included offense of knowing and intentional child abuse not resulting in serious bodily injury. Wright's brief contains no separate argument addressing this assignment of error. Instead, within her argument appearing under a heading that is essentially a restatement of her first assignment of error, Wright asserts in one sentence that "[e]ven viewing the evidence in a light most favorable to the State, no rational trier of fact could find that this evidence proved Wright guilty beyond a reasonable doubt." Brief for appellant at 6.

Despite Wright's failure to offer a separate argument specifically in support of her second assignment of error, we read her argument on appeal as a challenge to the sufficiency of the evidence for her conviction, and we address it as such. See *State v. Sanders*, 269 Neb. 895, 697 N.W.2d 657 (2005) (addressing defendant's argument as a challenge to the sufficiency of the evidence despite fact that assignment of error related solely to failure to direct a verdict in defendant's favor). Accordingly, we now turn to the issue of the sufficiency of the evidence.

As pertinent here, a person commits child abuse if he or she knowingly, intentionally, or negligently causes or permits a minor child to be: placed in a situation that endangers his or her life or physical or mental health; cruelly confined or cruelly punished; or deprived of necessary food, clothing, shelter, or care. § 28-707(1). Child abuse is a Class II felony if it is committed knowingly and intentionally and results in serious bodily injury. § 28-707(7). Child abuse is a Class IIIA felony if it is committed knowingly and intentionally and does not result in serious bodily injury or death. § 28-707(4). Knowing and intentional child abuse not resulting in serious bodily injury is a lesser-included offense of knowing and intentional child abuse resulting in serious bodily injury. See *State v. Molina*, 271 Neb. 488, 713 N.W.2d 412 (2006). As stated, Wright was charged with the greater offense but convicted of the lesser-included offense.

Although the State was unable to produce direct evidence establishing precisely what happened in Wright's home when K.M. was injured, the State presented evidence of the circumstances surrounding K.M.'s injuries, the severity and pattern of his injuries, and the significant force necessary to produce the injuries. Viewing the evidence in the light most favorable to the State, as we must, we conclude that a rational trier of fact could have found that the State established beyond a reasonable doubt that Wright was guilty of knowing and intentional child abuse not resulting in serious bodily injury, as we now explain.

As to the circumstances surrounding K.M.'s injuries, the State's evidence established that K.M. was in Wright's care from the evening of January 27, 2014, throughout the day on January 28, until the time Wright brought K.M. to the emergency room at the Nebraska Medical Center. The evidence showed that although Wright's boyfriend, K.M.'s father, had been in and out of the home during that period, Wright was present whenever her boyfriend was there. Furthermore, although Dr. Haney's testimony regarding the timing of the injury was less than conclusive at times, Dr. Haney ultimately testified that her opinion within a reasonable degree of medical

certainty was that K.M.'s injuries "most likely occurred at the time that [Wright] was alerted to her child's distress." At that time, Wright was the only adult present, as her boyfriend had left to pick up Wright's oldest child from school. See *State v. Leibhart*, 266 Neb. 133, 662 N.W.2d 618 (2003) (upholding conviction of first degree assault where evidence showed that defendant was the sole adult in 18-month-old's presence at time child sustained injuries consistent with shaken baby syndrome). Notably, Wright does not address the issue of the timing of K.M.'s injuries on appeal, and she did not address the issue of timing before the district court, either during cross-examination of Dr. Haney or during opening or closing statements.

Although Wright told Dr. Haney and Lieutenant Swanson that she believed K.M. had fallen off of the couch while she was in the bathroom, Dr. Haney testified that falling off of a couch onto a carpeted floor would not have resulted in the injuries K.M. sustained. Dr. Haney specifically testified that "the pattern of the skull fracture was not consistent with that type of fall." According to Dr. Haney, K.M. had skull fractures on both sides of his head, and the fractures were "comminuted" or "essentially shattered" and went from "the parietal bones . . . down into the temporal bones." One of the fractures was "mildly depressed or separated a little bit." In addition, K.M. had bleeding underneath both fractures and "all around his brain," as well as a retinal hemorrhage resulting in bleeding in the back of his right eye.

Dr. Haney was not equivocal when it came to explaining the amount of force necessary to cause such injuries. She testified that the fractures indicated "[s]ignificant trauma" requiring "significant force," and she described the mechanism of injury as "blunt force trauma." Dr. Haney also testified that a retinal hemorrhage like K.M.'s "can be seen with significant blunt force trauma to the head." She had seen injuries as severe as K.M.'s "with a child doing a header out of a two-story window." Similarly, she would expect to see comparable injuries in a child who had been ejected from a car onto his or her head, or in a child who had been slammed onto his or her head.

It is against the backdrop of the severity of K.M.'s injuries and the force necessary to produce them that we must view Dr. Haney's testimony that it was possible that an accident could have accounted for K.M.'s injuries. While Dr. Haney testified on cross-examination that K.M.'s injuries could have resulted from an accidental drop from a higher height than a couch, the implication in light of her other testimony was that the drop would have to have been from a much higher height. Or, as Dr. Haney also testified on cross-examination, if Wright had told her that she had fallen on top of K.M. with her body weight added, Dr. Haney would have been "fine with that." However, as Dr. Haney further testified, Wright provided no history of an accident that could have accounted for K.M.'s injuries. Wright's assertion that Dr. Haney testified that "the mechanism of [K.M.'s] injury was an accidental drop from a higher height," brief for appellant at 6, clearly misconstrues the doctor's testimony.

Viewing the evidence in the light most favorable to the State, we disagree with Wright that the evidence was insufficient to support a finding that she acted knowingly and intentionally in causing K.M.'s injuries. "Intent is the state of the actor's mind when the actor's conduct occurs," and it "may be inferred from the words and acts of the defendant and from the circumstances surrounding the incident." *State v. Parks*, 253 Neb. 939, 949, 573 N.W.2d 453, 460 (1998). Considering the circumstances surrounding K.M.'s injuries, the severity and pattern of the injuries,

and the significant force necessary to produce the injuries, the evidence was sufficient to support a finding that Wright was responsible for K.M.'s injuries and that she acted knowingly and intentionally. See *State v. Blair*, 272 Neb. 951, 726 N.W.2d 185 (2007) (intent with which act is committed may be inferred from words and acts of defendant and from circumstances surrounding incident). In sum, the evidence was sufficient to support Wright's conviction of the lesser-included offense of knowing and intentional child abuse not resulting in serious bodily injury.

Because the evidence was sufficient to support Wright's conviction of the lesser-included offense, it also was not error for the court to overrule Wright's motion for a directed verdict. See *State v. James*, 265 Neb. 243, 655 N.W.2d 891 (2003) (in bench trial, if evidence adduced would warrant conviction of lesser-included offense and defendant has been afforded fair notice of lesser offense, court may consider lesser-included offense).

## CONCLUSION

For the foregoing reasons, we affirm the judgment of the district court for Douglas County.
AFFIRMED.