STATE OF NEBRASKA, APPELLEE, V.
RICHARD K. COOK, APPELLANT.
667 N.W.2d 201

Filed August 1, 2003.   No. S-01-951.

Clarence E. Mock III and Denise E. Frost, of Johnson & Mock, for appellant.

Don Stenberg, Attorney General, and Kimberly A. Klein for appellee.

HENDRY, C.J., WRIGHT, CONNOLLY, GERRARD, STEPHAN, McCORMACK, and MILLER-LERMAN, JJ.

MILLER-LERMAN, J.
## I. NATURE OF CASE
Richard K. Cook was convicted in the district court for Douglas County of first degree murder and use of a weapon to

commit a felony. Cook was sentenced to life imprisonment on the murder conviction and 49½ to 50 years' imprisonment on the weapons conviction. Cook appeals his convictions and sentences. We affirm.

## II. STATEMENT OF FACTS

### 1. DISCOVERY AND INVESTIGATION OF CRIME

On the morning of April 29, 2000, two men found the body of a young woman, later identified as Amy Stahlecker, on the bank of the Elkhorn River near the intersection of West Maple Road and Highway 275 in Douglas County, Nebraska. Stahlecker's body had multiple gunshot wounds, including a shot to the back of the head that exited through the face and two shots to the face that exited through the back of the head. The men notified law enforcement officers of their discovery, and the Nebraska State Patrol began an investigation of the crime.

The body was found at a point along the river where the river was spanned by a bridge that was part of West Maple Road. At and near the bridge, West Maple Road was a four-lane concrete road with two eastbound and two westbound lanes separated by a concrete median. Investigators found a large blood smear and a trail of blood drops on the bridge, the median, and the eastbound lanes of West Maple Road. The trail of blood drops led from the median to the north side of the bridge directly above where the body was found. Blood from the stain was later tested, and the DNA was consistent with that of Stahlecker. On the median, investigators found bullet and scalp fragments and a bracelet that had been worn by Stahlecker.

A white Ford Explorer with a blown tire was found along Highway 275 near an intersection with West Maple Road and near the location where Stahlecker's body was found. It was later discovered that the Explorer was owned by Stahlecker's friend, Angella Dowling. On Friday evening, April 28, 2000, Stahlecker left her mother's home in Fremont, Nebraska, and went to her cousin's home in Arlington, Nebraska. Stahlecker and her cousin then joined Dowling, and the three drove in the Explorer to Omaha for dinner. After dinner, they met other friends at a bar in Omaha and stayed there until about 1 a.m. on April 29. Stahlecker's cousin and Dowling decided to stay in

Omaha with their respective boyfriends, and it was determined that Stahlecker would drive the Explorer to Fremont for the night and then return to Omaha the next morning to pick up the other two women. Although Stahlecker's subsequent route is unknown, she was apparently heading west on Highway 275 toward Fremont when the Explorer blew a tire near the spot where the Explorer was found that same morning.

An autopsy on Stahlecker's body revealed various abrasions and contusions in addition to the gunshot wounds to the head and face. Bruises were found on both forearms and on some fingers of the left hand. Contusions and abrasions were found on both legs, and there was a gunshot wound to the hip. The forensic pathologist who testified at trial opined that bruises on the right knuckles could have been "defensive" injuries sustained while Stahlecker was still alive. The pathologist also opined that the gunshot wound to the back of the head which exited through the face was the fatal wound and was a "distant shot" that was not fired at close range. The two shots to the face were fired at an "intermediate" range within 2 feet of the face. In the pathologist's opinion, the two shots to the face were not the fatal shots and were the result of very rapid gun discharge or were fired at a time when Stahlecker was unconscious. The autopsy revealed that Stahlecker had a blood alcohol content of .156 when she died. The autopsy also revealed semen in the vaginal area, indicating intercourse shortly before death; however, the autopsy showed no evidence of vaginal or anal tears or bruising.

Investigators had no suspect in the killing until May 2, 2000, when a Washington County deputy sheriff was contacted by Michael Hornbacher through a mutual friend. The deputy was acquainted with Hornbacher as well as Cook, a friend of Hornbacher and the defendant in this case. Hornbacher told the deputy that Cook had confessed to killing Stahlecker. The deputy interviewed Hornbacher at his office in Omaha, and Hornbacher later went to the Nebraska State Patrol offices where he gave investigators oral and written statements. Based on the information provided by Hornbacher, investigators went to the Norwest Financial branch office in Council Bluffs, Iowa, where Cook worked. The investigators did not formally arrest Cook but told

him he needed to come with them to the State Patrol offices in Omaha to be interviewed regarding the Stahlecker investigation. Investigators transported Cook to Omaha and did not allow him to drive his own vehicle, a Ford F-150 pickup truck.

Officers took Cook's truck to the State Patrol offices while Cook was being interviewed. They later returned the truck to Council Bluffs, obtained a search warrant, and brought the truck back to Nebraska State Patrol headquarters in Omaha, where the truck was searched. The search revealed blood traces on the interior of the driver's side door and floormat. Later DNA tests showed that the blood traces were consistent with Stahlecker's blood. Clothing fibers found on the passenger-side seat were consistent with the fabric of underwear worn by Stahlecker.

During the interview, investigators photographed Cook's face and body. Cook's hands and forearms showed substantial scrapes and cuts. Cook's supervisor at Norwest Financial later testified that she had noticed the injuries to Cook's arms and hands on Monday, May 1, 2000, and that he had told her he was injured after falling off his bicycle over the weekend.

### 2. COOK'S ARREST AND TRIAL

Cook was arrested, and on June 12, 2000, the State filed an information charging Cook with first degree murder and use of a weapon to commit a felony. Cook pled not guilty, and a jury trial was conducted April 16 through 26, 2001.

At trial, both Hornbacher and Cook testified regarding the events of April 28 and 29, 2000. Their stories were substantially similar regarding the events of the evening of April 28, but their stories differed markedly regarding the events which occurred after midnight on April 29. Cook got home from work on Friday, April 28, at about 6:15 p.m. and soon thereafter told his wife, Jeanette Cook (Jeanette), that he was going out. Cook and Hornbacher met to work out together at a gym. The two had been friends for several years. They both worked for Norwest Financial and frequently worked out together. After working out, they stopped at a sandwich shop and then went to the apartment shared by Hornbacher and his girl friend, Michelle Childs. Childs had already left the apartment to go to McCormack's sports bar to play volleyball. Cook and Hornbacher went to McCormack's to

watch Childs' volleyball game. They drove in Cook's truck and arrived at McCormack's at about 8:30 p.m.

Cook and Hornbacher stayed at McCormack's after the volleyball game, socializing with various people. Both drank several beers and some shots. After some time, Childs and Hornbacher got into an argument because she was upset that he was getting drunk and that he did not want to leave when she was ready to go. Childs decided to leave and asked whether Cook could give Hornbacher a ride and whether Hornbacher could stay at Cook's apartment that night. Cook agreed and called his wife, Jeanette, at around 11:40 p.m. to let her know Hornbacher would be staying with them. Jeanette, who was angry with Cook for staying out late, did not answer the telephone and allowed the answering machine to take his message.

Hornbacher and Cook stayed at McCormack's for approximately another hour. Hornbacher's and Cook's stories diverge at the point when they left McCormack's. At trial, Hornbacher testified for the State and Cook testified in his own defense. Their differing versions of events are recounted below.

### 3. HORNBACHER'S VERSION

Hornbacher testified that he and Cook left McCormack's separately. Hornbacher saw Cook leave in Cook's truck, and Hornbacher got a ride from two women he did not know and a man he had met that night. They drove Hornbacher to his and Childs' apartment, where he let himself in and passed out in bed. Hornbacher woke up around 11 or 11:30 a.m. on Saturday, April 29, 2000. Hornbacher argued with Childs and decided to leave the apartment. Hornbacher could not find his keys, cellular telephone, and checkbook and realized he might have left them in Cook's truck the night before. Hornbacher called Cook to arrange to pick up the items he had left in Cook's truck. Cook did not want Hornbacher to come to Cook's apartment, so they arranged for Cook to pick up Hornbacher in front of Hornbacher's apartment. After getting off the telephone, Hornbacher told Childs he thought Cook was "acting pretty weird."

Cook picked up Hornbacher some time later. As they drove in the truck, Hornbacher could tell Cook was upset, and Cook indicated that he was concerned about something that would affect

his family. Cook drove to Walnut Grove Park, where he parked the truck, and Cook and Hornbacher talked for what Hornbacher described as "an eternity." Hornbacher testified that Cook told him that after he left McCormack's, he had driven out west on Highway 275, where he encountered a young woman with a flat tire. Hornbacher noticed abrasions on Cook's arms but Cook would not tell Hornbacher how he got them. Hornbacher's cellular telephone rang, and he located it beneath the seat. Cook told Hornbacher that the telephone must have fallen beneath the seat when he and the woman with the flat tire had sexual intercourse in the front seat of the truck. Cook showed Hornbacher a scrap of paper tucked into the sun visor and told Hornbacher the woman had given him her name and telephone number. Cook then told Hornbacher that after the intercourse, the woman had "weirded out," and Cook thought she might try to claim that he had raped her. Cook ordered the woman to get out of the truck, and then he "lost it" and grabbed his 9-mm handgun from the truck's console and "unloaded" it on the woman. Cook told Hornbacher he then dumped the woman's body in a ravine.

Cook drove Hornbacher back to Hornbacher's apartment and regained his composure on the way. Cook told Hornbacher he had cleaned his truck twice that morning in order to get rid of any evidence linking him to the woman's death. Cook left, and Hornbacher went into his apartment where Childs was still in bed. Hornbacher recounted to her his conversation with Cook. Hornbacher stayed at his own apartment the rest of the day.

Hornbacher and Childs heard media reports about Stahlecker's death on Sunday, April 30, 2000. Hornbacher testified that he wanted to urge Cook to confess to authorities, but Childs objected. Hornbacher did nothing until the evening of Monday, May 1, when he contacted the aforementioned mutual friend to get him into contact with the Washington County sheriff's deputy. Hornbacher spoke to the deputy on Tuesday, May 2, and told him about Cook's confession.

### 4. COOK'S VERSION

Cook testified in his own defense. He testified that while they were at the bar, he drank two shots provided by Hornbacher. One was a shot of "GHB," a substance sometimes called the "date

rape drug," which acts as a sedative, diminishing inhibitions and blotting out memory. Cook was drunk at the time Hornbacher gave him the GHB and did not take it intentionally. When he and Hornbacher left McCormack's, Cook saw Hornbacher get into a car with some other people. Cook decided to follow them in his truck because he had told Childs that Hornbacher could stay at Cook's apartment. The other people took Hornbacher to Hornbacher's apartment. Cook saw Hornbacher at his apartment door, fumbling for his keys. Cook pulled up and told Hornbacher he had left his keys in Cook's truck. Hornbacher got into Cook's truck, and the two decided to go to a bar in Fremont that featured female strippers. Cook thought the bar might still be open.

While driving toward Fremont on Highway 275, Cook encountered Stahlecker and the disabled Ford Explorer. Cook decided to stop to help her, despite Hornbacher's protests. Cook tried to change the tire but decided he could not because the rim was bent. He could not call for help because his cellular telephone did not work, and he could not find Hornbacher's cellular telephone, which had fallen beneath the seat. Cook decided they should look for an open service station to get help. Stahlecker got into the front seat with Cook, and Hornbacher got into the back seat, where he passed out or fell asleep. Cook drove toward Omaha on West Maple Road.

They found no open service station, and Stahlecker suggested they return to the Explorer. Neither Cook nor Stahlecker was certain where the Explorer was, and they had trouble finding it. Cook suggested that they just "chill out," since they were both drunk, and he pulled into an off-road area on West Maple Road. He and Stahlecker laughed, talked, and listened to the radio while Hornbacher was passed out or sleeping in the back seat. Cook offered to give Stahlecker a back rub, and she agreed. Cook testified that they were soon engaged in sexual foreplay and began undressing. They then engaged in what Cook described as consensual sexual intercourse in the front passenger seat.

As they were dressing, Cook told Stahlecker he would like to see her again and he gave her one of his business cards so she could give him her telephone number. She wrote "Amie" and a Fremont telephone number on the card and gave it back to him. At that time, Hornbacher spoke up from the back seat. Neither

Cook nor Stahlecker had realized he was awake. Hornbacher forcefully demanded that Stahlecker perform oral sex on him. She refused, and Hornbacher began to argue with her. The argument escalated despite Cook's attempts to calm Hornbacher, and Hornbacher reached over the seat to grab Stahlecker's shoulder. She pulled away, opened the passenger-side door, and walked up to West Maple Road.

Cook got out of the truck, intending to either give Stahlecker her keys or offer her a ride home. He then heard two gunshots and turned to see Hornbacher leaning out of the driver's side window with Cook's gun in his hand, shooting at Stahlecker. Cook began to run toward Stahlecker. Because it was dark, he did not see the median on West Maple Road, and he ran into the median and tripped, scraping his arms and hands. Cook heard the truck accelerating behind him and saw Hornbacher drive the truck up onto West Maple Road. When Hornbacher caught up to Stahlecker, he parked the truck, jumped out of it with the gun, and followed her. Cook saw Hornbacher shoot Stahlecker in the back of the head from a distance of about 10 feet. Stahlecker collapsed. Hornbacher approached her, and when he was within 5 feet, Hornbacher shot her twice in the face.

Cook ran to Stahlecker and checked for a pulse. Finding no pulse, he realized she was dead. Cook asked Hornbacher why he had killed her. Hornbacher did not reply but instead told him to "get her off the road." Because Hornbacher still had the gun and Cook feared for his own safety, he did as Hornbacher directed. Together they dragged Stahlecker's body across the road and shoved it off the bridge. Cook saw Hornbacher pick up Stahlecker's keys, which Cook had dropped. Cook and Hornbacher got into the truck to return to Omaha. They were driving east on Dodge Street back into Omaha, and when they approached a bridge over the Elkhorn River, Hornbacher told Cook to slow down. As they were driving over the bridge, Hornbacher threw Stahlecker's keys into the river. Cook speculated that Hornbacher might also have thrown Cook's gun into the river, because Cook did not know where it was.

The two continued into Omaha and argued about what to do next. Cook testified that Hornbacher threatened that if he said anything about Stahlecker's death, Cook "would go down, too."

Cook dropped Hornbacher off at Hornbacher's apartment at about 3:30 a.m. and told him they should talk after they sobered up. Hornbacher took the gun's ammunition and clip with him. On his way home, Cook stopped at a carwash where he washed blood off the seats and vacuumed the interior of the truck. He arrived home about 4:30 a.m. He undressed and washed the scrapes on his hands and arms and applied antibiotic ointment before going to bed. Cook's wife, Jeanette, was awake, and he showed her his injuries. He told her he had been in a fight but that if anyone asked her, she should say he was injured falling off his bicycle.

Cook slept until about 7 a.m., when he awoke and began routine Saturday morning chores. He washed a load of laundry, including the clothes he had worn the night before. Cook drove to Standing Bear Lake, where he rode his bicycle on the trails. Before long, he fell off the bicycle and landed on his arms and hands. Cook returned home around 10 a.m. Jeanette was sleeping but their daughter was awake, and he gave her breakfast. Jeanette awoke around 12:30 p.m. and was angry with Cook for going out the night before. She left to go study. After Jeanette left, Hornbacher called Cook. The two decided to meet at Hornbacher's apartment, and Cook picked him up at about 1:30 p.m. At trial, Cook attempted to give testimony regarding his version of their conversation in the truck. However, the court sustained the State's hearsay objections, and Cook made no offer of proof of the testimony he would have given regarding the conversation.

### 5. OTHER WITNESSES AND EVIDENCE

Various other witnesses testified for the State, and Cook offered other testimony and evidence in his defense. Additional evidence and testimony which relates to Cook's assignments of error on appeal will be related here.

Immediately after Hornbacher testified at trial, the State called Childs as a witness. She testified similarly to Hornbacher and Cook regarding the events of April 28, 2000. In addition, she testified that Hornbacher got home at around 12:50 a.m. and did not go out again. Childs also testified that after Hornbacher met with Cook the following day, he came home and told her that Cook had told Hornbacher that the night before, Cook had

had consensual sex with a woman and thereafter shot her. In most respects, Childs' version of Cook's statements was similar to Hornbacher's testimony.

The State also presented the testimony of Amy Hoffmeyer. Hoffmeyer worked with Childs and played volleyball with her at McCormack's on April 28, 2000. After volleyball, Hoffmeyer remained at McCormack's, socializing with various people including Hornbacher and Cook. Hoffmeyer testified that as she was putting her keys into the ignition of her car after leaving the bar, Cook knocked on the window. He told her he wanted her to come back into the bar to get to know him better. She said no, but Cook persisted with his requests, at one point reaching into the car to put his hand on her shoulder. She mentioned that she knew he was married but that he said he did not care. Cook eventually gave up, and she drove home. On cross-examination, Hoffmeyer testified that she had not felt threatened by Cook, she just thought it odd that he wanted to get to know her better considering that he was married.

Before Cook testified in his defense, a hearing was held outside the presence of the jury in which Cook's attorney said he anticipated that the State would cross-examine Cook about an incident with "a woman named Yvette" that occurred at McCormack's on the evening of April 28, 2000. In the hearing, it was stated that a woman named "Yvette Carmen" had told friends that while she was on her way to the bathroom, Cook had grabbed her, took her to the parking lot, started to kiss her, and put his hand down her pants. Cook also apparently tried to get her into his truck. Cook's attorney wanted to get any such question prohibited as improper prior bad acts evidence. The State argued the evidence was offered for the purpose of showing Cook's intent to get a woman into his truck to have sex. After much discussion, the district court stated, "The sexual acts is [sic] 403. The other, getting into the truck, I'll just rule when the time comes." See Neb. Rev. Stat. § 27-403 (Reissue 1995).

During cross-examination, the State asked Cook to tell about the incident where he followed Hoffmeyer outside to her car. After Cook told his side of the story, the State asked about a subsequent time that evening that Cook had gone out to the parking lot. Cook said that he had gone outside to get some fresh air and

that "[s]omeone did come outside with me, but I did not ask them [sic] to come outside with me." Upon further questioning, Cook stated that he did not know the person's name but that the person was female. The State asked what Cook and the female did in the parking lot, and Cook stated, "We — again, we talked, and we kissed and that was it. We were out there for less than five minutes and came back in." Throughout this questioning, Cook's attorney objected on the basis of relevance and the district court overruled the objections. Finally, the State asked, "Did you ask her to get in your truck with her [sic]?" Cook's attorney then objected, and the court sustained the objection. The State then moved on to a different line of questioning.

Jeanette testified for the State regarding, inter alia, her interaction with Cook on April 29, 2000, the day following the killing of Stahlecker. During cross-examination, Cook's attorney asked whether at about 12:30 p.m. of that day she had gone to study but had instead written a letter to Cook. She said that she had. When Cook's attorney began to question Jeanette further about the letter, the State objected on the basis of hearsay and relevance. During a side-bar conference, it was stated that the letter was never given to Cook and that instead Jeanette had given it to the defense attorney some time after Cook's arrest. The court sustained the hearsay objection but allowed Cook to make an offer of proof of the letter. In the letter, Jeanette expressed that she was angry with Cook for having been out late with Hornbacher the night before. She also expressed her ongoing dissatisfaction related to Cook's friendship with Hornbacher and recounted various incidents in which she thought Hornbacher had a negative influence on Cook, including incidents in which Cook covered for Hornbacher because he was cheating on his girl friend. Jeanette expressed her desire that Cook not allow his friendship with Hornbacher to affect his relationship with her.

Charles O'Callaghan, an investigator for the Nebraska State Patrol, testified for the State regarding the investigation of Stahlecker's killing. During cross-examination, defense counsel asked whether O'Callaghan had executed a search warrant on Hornbacher's residence, and O'Callaghan replied that he had not. On redirect, in reference to the testimony that investigators had not searched Hornbacher's residence, the prosecutor elicited

testimony that in order to get a search warrant, investigators must have probable cause that the person committed a crime. The prosecutor asked O'Callaghan, "At any point in time in this investigation, did you have probable cause that Mike Hornbacher committed any crime?" O'Callaghan replied, "No."

Michael Auten, a state patrol forensic chemist, testified for the State. Defense counsel elicited testimony from Auten that if ordered to do so, Auten could test the clothes worn by Hornbacher on the night of the killing to test for comparison to fibers found in Cook's truck and on Stahlecker's clothing. In a side-bar conference, defense counsel moved for an order for production of Hornbacher's clothing for fiber analysis. The court denied the motion, and defense counsel did not pursue the issue further.

During Hornbacher's testimony, on cross-examination, the following exchange occurred between defense counsel and Hornbacher:

[Defense counsel:] You had never known . . . Cook to be violent with a woman before, did you, sir?

[Hornbacher:] Not until after this trial started.

[Defense counsel:] And —

[Hornbacher:] I take that back. I do.

[Defense counsel:] Excuse me, sir. At the time that you gave this statement on May 10th, did you indicate that you had never seen him do that to a woman?

[Hornbacher:] I've never seen him do it to a woman, no.

Defense counsel then moved on to other questioning.

### 6. MOTIONS, VERDICT, AND SENTENCING

The State charged Cook with first degree murder under alternative theories. In the information, the State charged that Cook "did . . . purposely and with deliberate and premeditated malice, or during the perpetration of, or attempt to perpetrate a First Degree Sexual Assault, kill Amy Stahlecker." Cook was also charged with use of a weapon to commit a felony, but Cook was not separately charged with first degree sexual assault.

At the end of the State's case, Cook's attorney moved the court:

for a dismissal of these charges against the defendant for the reason that the State has failed to meet it's [sic] prima facie case against the defendant. And my guess is you'll probably

let it go to the jury on the issue of first degree murder, but I'm going to ask the Court to consider dismissing the action against the defendant on the first degree sexual assault. And then in the alternative, sir, I would ask the Judge — this Court to enter an acquittal of the defendant on those two charges, but particularly the sexual assault charge.

The district court overruled the motion. At the end of all the evidence, Cook renewed his motion and the district court again overruled it.

Cook's attorney objected to the jury instruction on the count of first degree murder, stating, "I'm going to object to this, the State being able to charge Mr. Cook with both deliberate and premeditated malice or during the perpetration of a first degree sexual assault." The district court asked, "Do you think the State should be required to elect?" When Cook's attorney replied in the affirmative, the district court overruled the objection. In instructing the jury on the charge of murder, the district court gave a step instruction, in which it instructed the jury on four types of homicide: first degree murder-felony murder, first degree murder-premeditated murder, second degree murder, and manslaughter. As part of the step instruction, the district court instructed the jury to first consider whether Cook committed felony murder and, if it found that he had not, then to consider whether he committed premeditated murder.

On April 26, 2001, the jury returned verdicts finding Cook guilty of first degree murder and use of a firearm to commit a felony. The verdict form stated that the jury found Cook guilty of "Murder in the First Degree" but did not specify whether the jury found him guilty of "first degree murder-felony murder" or "first degree murder-premeditated murder." Cook, through defense counsel, filed a motion for new trial. Cook, pro se, filed additional motions for new trial. The district court overruled the motions for new trial.

A presentence investigation report was prepared prior to sentencing. The report included a probation officer's report, in which the probation officer concluded that Cook "has a very volatile temper, is a womanizer and could almost be considered a sociopath" and that Cook is "a very dangerous individual." The probation officer then asked that the district court "consider

life imprisonment with an additional 50 years for the charge of Use of a Firearm to Commit a Felony." The report also contained various letters written in support of Cook.

On July 20, 2001, the court sentenced Cook to life imprisonment on the first degree murder conviction and to 49½ to 50 years' imprisonment on the weapons conviction. Cook appeals his convictions and sentences.

## III. ASSIGNMENTS OF ERROR

Cook asserts that the district court erred in (1) sustaining the State's hearsay objection and disallowing Cook's testimony regarding his version of his conversation with Hornbacher on the day following Stahlecker's killing, (2) overruling Cook's motion for directed verdict on the felony murder theory of the first degree murder charge, (3) allowing evidence of prior bad acts involving Hoffmeyer and Carmen and failing to give a limiting instruction with regard to such evidence, (4) sustaining the State's hearsay objection and disallowing evidence of the contents of the letter Jeanette wrote to Cook, (5) failing to order that Cook be allowed to review the presentence investigation report prior to sentencing, (6) imposing an excessive sentence; and (7) overruling his motions for mistrial and for a new trial.

Cook also asserts that he was denied effective assistance of counsel and that his trial counsel was deficient in the following respects: (1) failing to object to hearsay testimony by Childs that Hornbacher told her that Cook had told him that he had killed Stahlecker, (2) failing to object to the testimony of Hoffmeyer which Cook asserts was evidence of a prior bad act, (3) eliciting testimony from Hornbacher regarding Cook's prior incidents of violence toward women, (4) failing to request a limiting instruction regarding the proper use of prior bad acts evidence involving Hoffmeyer and Carmen, (5) failing to object to O'Callaghan's testimony regarding a determination of probable cause when no proper foundation had been established for such expert testimony, (6) failing to request a continuance in order to pursue fiber evidence which might have connected Hornbacher to the crime, and (7) failing to object to portions of the presentence investigation report which Cook asserts contained unsupported conclusions of the probation officer.

## IV. STANDARDS OF REVIEW

In proceedings where the Nebraska Evidence Rules apply, the admissibility of evidence is controlled by the Nebraska Evidence Rules; judicial discretion is involved only when the rules make such discretion a factor in determining admissibility. Where the Nebraska Evidence Rules commit the evidentiary question at issue to the discretion of the trial court, the admissibility of evidence is reviewed for an abuse of discretion. *State v. Brouillette*, 265 Neb. 214, 655 N.W.2d 876 (2003). The exercise of judicial discretion is implicit in determinations of relevancy, and a trial court's decision regarding it will not be reversed absent an abuse of discretion. *Id.*

Regardless of whether the evidence is direct, circumstantial, or a combination thereof, and regardless of whether the issue is labeled as a failure to direct a verdict, insufficiency of the evidence, or failure to prove a prima facie case, the standard is the same: In reviewing a criminal conviction, an appellate court does not resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh the evidence; such matters are for the finder of fact, and a conviction will be affirmed, in the absence of prejudicial error, if the evidence admitted at trial, viewed and construed most favorably to the State, is sufficient to support the conviction. *State v. Leibhart, ante* p. 133, 662 N.W.2d 618 (2003).

## V. ANALYSIS

### 1. TESTIMONY BY COOK REGARDING CONVERSATION WITH HORNBACHER

In his first assignment of error, Cook contends that the district court erred in sustaining the State's objection to testimony by Cook regarding his conversation with Hornbacher the day following the killing of Stahlecker. Because Cook made no offer of proof, we cannot find that his testimony would have met an exception to the hearsay rule, and we therefore conclude that the court did not err in sustaining the State's objection.

With respect to his own statements during the conversation, Cook argues that his testimony was not hearsay because it was offered to rebut express charges against him. Cook cites Neb. Rev. Stat. § 27-801(4)(a)(ii) (Reissue 1995), which provides that a statement is not hearsay if the declarant testifies at the trial or

hearing and is subject to cross-examination concerning the statement, and the statement is consistent with his testimony and is offered to rebut an express or implied charge against him of recent fabrication or improper influence or motive.

With respect to Hornbacher's statements during the conversation, Cook argues that his testimony was admissible under Neb. Rev. Stat. § 27-613 (Reissue 1995) as extrinsic evidence of a prior inconsistent statement by a witness regarding a material fact. Section 27-613(2) provides in part, "Extrinsic evidence of a prior inconsistent statement by a witness is not admissible unless the witness is afforded an opportunity to explain or deny the same and the opposite party is afforded an opportunity to interrogate him thereon, or the interests of justice otherwise require." Cook argues that Hornbacher was available to be afforded an opportunity to explain or deny any statements which Cook would testify that Hornbacher had made.

Cook notes three points in his testimony regarding the conversation with Hornbacher where hearsay objections were sustained. First, defense counsel asked Cook, "Can you tell the ladies and gentlemen of the jury what the nature of the conversation was between you and . . . Hornbacher?" The State objected on the basis of hearsay, and the court stated, "The question calls for hearsay. That's sustained." Next, defense counsel immediately stated "Okay. Do you remember what you — you can't talk about what . . . Hornbacher said. Do you remember what you had discussed with Mr. Hornbacher?" Cook began to reply, "I discussed what I had told . . . ." The State broke in to object on the basis of hearsay, and the court sustained the objection.

Finally, a bit later, defense counsel asked Cook, "Did you and . . . Hornbacher arrive at some sort of plan of action, if you will, as a result of the driving around you did?" Cook replied

> Not really. We discussed what had happened the night before. He was worried sick about his phone until it went off and actually rang, and he was really relieved that it did. He was also worried sick about his checkbook that was missing. He felt it was going to be out at the crime scene. He and I discussed that. He, again, reiterated to me that . . . .

The State interrupted to object to what Hornbacher reiterated on the basis of hearsay, and the court sustained the objection. Cook

made no offer of proof at these three points or at any other point as to what he would have testified in response to the questions.

Cook argues that his assignment of error may be reviewed on appeal despite his failure to make an offer of proof. Cook cites Neb. Rev. Stat. § 27-103(1) (Reissue 1995) which provides:

> Error may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected, and . . . (b) In case the ruling is one excluding evidence, the substance of the evidence was made known to the judge by offer or was apparent from the context within which questions were asked.

Cook also cites *Anderson/Couvillon v. Nebraska Dept of Soc. Servs.*, 253 Neb 813, 572 N.W.2d 362 (1998) (in absence of offer of proof, question becomes whether substance of evidence was apparent from context within which question was asked). Cook argues that in the present case, despite the lack of an offer of proof, the substance of his proposed testimony was apparent from the context within which the questions were asked.

The lack of an offer of proof in this case prevents this court from determining the nature of the proposed testimony and therefore from determining its admissibility. Each of the questions to which the State objected asked for testimony regarding an out-of-court statement, and without an offer of proof, we cannot determine on appeal whether such statements would have met an exception to the hearsay rule. The substance of Cook's proposed testimony was not apparent from the context in which the questions were asked. The questions generally called for testimony regarding the content of the conversation, but the specific content to which Cook would have testified was not apparent. It would require speculation on this court's part to find that such proposed testimony would have met either of the categories of admissible testimony urged by Cook on appeal. We therefore reject Cook's first assignment of error.

## 2. DIRECTED VERDICT ON FELONY MURDER

For his second assignment of error, Cook asserts that the district court erred in denying his motion for a directed verdict on a portion of the State's charges against him. In particular, Cook argues that the evidence with respect to sexual assault as a

predicate for felony murder was not sufficient to establish that sexual penetration was without consent. We conclude that the evidence was sufficient to submit the charges to the jury and that therefore, the district court did not err in overruling Cook's motion for directed verdict.

Cook argues that the district court should have directed a verdict on the felony murder theory of first degree murder because the State failed to put on evidence that Cook's sexual intercourse with Stahlecker was without consent. The State argues that there was sufficient evidence to support submitting an instruction on felony murder based on sexual assault to the jury and notes evidence that Cook had numerous scrapes on his arms and hands and that in addition to the gunshot wounds, Stahlecker had numerous injuries, some defensive, on her hands, arms, legs, and toes. The State also notes that Cook gave differing stories as to how he received his wounds. He told Jeanette that he sustained the injuries in a fight but told her to tell others that he sustained the injuries in a fall from his mountain bike. Further, Cook testified at trial that he sustained the injuries when he tripped over a median on Highway 275 while fleeing from Hornbacher. The State argues that the wounds to both Cook and Stahlecker and Cook's attempts to cover up the cause of his injuries could lead a jury to infer that there was a struggle between Cook and Stahlecker and a sexual assault.

In a criminal case, a court can direct a verdict only when there is a complete failure of evidence to establish an essential element of the crime charged or the evidence is so doubtful in character, lacking probative value, that a finding of guilt based on such evidence cannot be sustained. *State v. Segura*, 265 Neb. 903, 660 N.W.2d 512 (2003). If there is any evidence which will sustain a finding for the party against whom a motion for directed verdict is made, the case may not be decided as a matter of law, and a verdict may not be directed. *Id.*

We conclude that the evidence in the present case was sufficient to prevent a directed verdict on the felony murder charge. The evidence noted by the State with respect to the element that sexual penetration be without consent was sufficient to support a jury finding that sexual intercourse was without consent and was instead a product of sexual assault, thus precluding a directed

verdict. The jury could reasonably infer that the injuries indicated that the sexual intercourse between Cook and Stahlecker was without Stahlecker's consent. There was not a complete failure of evidence to establish the underlying felony of sexual assault as an element of felony murder, and the jury could reasonably have found Cook guilty of first degree murder under a felony murder theory. The district court therefore did not err in rejecting Cook's motion for directed verdict, and we reject Cook's second assignment of error.

### 3. Prior Bad Acts With Amy Hoffmeyer and Yvette Carmen

As his third assignment of error, Cook asserts that the district court erred in allowing the jury to hear otherwise inadmissible evidence regarding Cook's interactions with Hoffmeyer and Carmen in violation of Neb. Rev. Stat. § 27-404(2) (Reissue 1995). Cook argues that such evidence was prior bad acts evidence offered for an improper purpose, that the procedural requisites of § 27-404(3) were not followed, and that the court failed to give a limiting instruction with respect to the purpose for which such evidence could be considered. Cook's arguments are limited to admission under § 27-404, and accordingly we so limit our analysis. The evidence regarding Hoffmeyer and the evidence regarding Carmen are in different postures procedurally, and therefore we will discuss each separately.

#### (a) Amy Hoffmeyer

Hoffmeyer testified at trial without objection by Cook. Cook complains on appeal that Hoffmeyer's testimony was inadmissible as improper prior bad acts evidence. A party who fails to make a timely objection to evidence waives the right on appeal to assert prejudicial error concerning the evidence received without objection. *State v. Harms*, 263 Neb. 814, 643 N.W.2d 359 (2002). Because Cook did not object to Hoffmeyer's testimony at trial, Cook has waived the right to assert prejudicial error regarding Hoffmeyer's testimony on appeal.

#### (b) Yvette Carmen

Although there was much discussion outside the presence of the jury about potential testimony regarding Carmen, Carmen

did not testify at trial, and the only evidence which might implicate Carmen was testimony by Cook on cross-examination that an unnamed woman had followed him to the parking lot and that they had briefly talked and kissed. Section 27-404(2) deals with evidence of "other crimes, wrongs, or acts" admitted "to prove the character of a person in order to show that he or she acted in conformity therewith." Whether or not the testimony regarding Cook's kissing an unnamed woman was evidence of an act admitted to prove his character, we conclude that any error in admitting the evidence was harmless error. To the extent the testimony regarding kissing an unnamed woman proved anything about Cook's character, it was cumulative of other testimony which Cook offered in his own direct examination, including Cook's testimony that he had had sexual intercourse with Stahlecker. Generally, erroneous admission of evidence is harmless error and does not require reversal if the evidence is cumulative and other relevant evidence, properly admitted, supports the finding by the trier of fact. *State v. Harms*, 264 Neb. 654, 650 N.W.2d 481 (2002). We therefore find no merit to Cook's third assignment of error.

### 4. JEANETTE COOK'S LETTER

As his fourth assignment of error, Cook asserts that the district court erred in disallowing evidence of the contents of the letter written to Cook by Jeanette. We conclude that Cook has demonstrated no exception to the hearsay rule which would allow admission of the letter.

Cook argues it was error to refuse to admit the letter into evidence because the letter was relevant to assess Jeanette's credibility and it gave evidence of Cook's relationship and history with Hornbacher which would explain Cook's actions in covering up for Hornbacher after Hornbacher allegedly killed Stahlecker. Cook argues that the letter was not hearsay because it was not offered to prove the truth of the matters asserted but to prove that the statements were made.

We agree with the State's argument that the letter was hearsay and that Cook has demonstrated no exception to the hearsay rule that would allow its introduction into evidence. "Hearsay" is defined in § 27-801(3) as "a statement, other than one made

by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted," and Neb. Rev. Stat. § 27-802 (Reissue 1995) provides that hearsay is not admissible except as provided by other rules. Although Cook argues the letter was not hearsay, the only apparent purpose for admitting the letter as evidence was to prove the truth of the matters asserted regarding the nature and history of Cook's friendship with Hornbacher. There was no apparent purpose in proving the mere fact that Jeanette was the author of the letter, particularly considering that the letter was never given to Cook and therefore could not have affected his actions. Further, the letter does not appear relevant to assessing Jeanette's credibility because Cook has demonstrated no inconsistency between statements she made in the letter and statements she made at trial. We therefore conclude the district court did not err in sustaining the State's objection to the letter, and we reject Cook's fourth assignment of error.

### 5. PRESENTENCE INVESTIGATION REPORT

As his fifth assignment of error, Cook asserts that the district court erred in failing to afford Cook an opportunity to review the presentence investigation report prior to sentencing. Cook notes that there is nothing in the record indicating that the court ordered that Cook be afforded an opportunity to personally review the report or that Cook did in fact see the report prior to sentencing. However, as the State notes, there is also nothing in the record indicating that Cook requested an opportunity to review the report or that his request was denied. Further there is nothing in the record indicating that Cook complained at sentencing or elsewhere that he had not had an opportunity to review the record. Because there is nothing in the record to indicate that Cook requested the opportunity to review the report or that the court denied such a request, we conclude there is no merit to Cook's assignment of error.

Neb. Rev. Stat. § 29-2261 (Cum. Supp. 2000) requires that "when an offender has been convicted of a felony, the court shall not impose sentence without first ordering a presentence investigation of the offender and according due consideration to a written report of such investigation." Subsection (6) of § 29-2261

provides in part that "[t]he court may permit inspection of the report or examination of parts thereof by the offender or his or her attorney, or other person having a proper interest therein, whenever the court finds it is in the best interest of a particular offender." We have held that a defendant has a qualified right to review his or her presentence report and that the defendant may, with his or her attorney, examine the presentence report subject to the court's supervision. *State v. Barrientos*, 245 Neb. 226, 512 N.W.2d 144 (1994); *State v. Clear*, 236 Neb. 648, 463 N.W.2d 581 (1990). However, we have also held that the defendant waives that qualified right by not notifying the trial court that he or she has not personally reviewed the report and that he or she wishes to do so. *Barrientos, supra.* See, also, *State v. Keller*, 195 Neb. 209, 237 N.W.2d 410 (1976) (where neither defendant nor attorney requested inspection of report, trial judge did not err by failing to furnish copy of report).

Where, as in the present case, no request has been made, the trial court has no affirmative duty to order a review by the defendant of the presentence investigation report. The district court did not err in failing to order a review, and we find no merit in Cook's fifth assignment of error.

### 6. EXCESSIVE SENTENCE

As his sixth assignment of error, Cook asserts that the district court imposed an excessive sentence. Two sentences were imposed on Cook. On the conviction for first degree murder, Cook was sentenced to life in prison, and on the conviction for use of a weapon to commit a felony, he was sentenced to 49½ to 50 years' imprisonment. The potential sentences for first degree murder are either death or life imprisonment. Because Cook received the more lenient sentence available upon conviction for first degree murder, his arguments regarding excessive sentence relate only to his sentence for use of a weapon to commit a felony.

Sentences within statutory limits will be disturbed by an appellate court only if the sentences complained of were an abuse of judicial discretion. *State v. Segura*, 265 Neb. 903, 660 N.W.2d 512 (2003). Use of a firearm to commit a felony is a Class II felony, Neb. Rev. Stat. § 28-1205(2)(b) (Reissue 1995), and the potential range of sentences for a Class II felony is a term

of imprisonment from 1 to 50 years, Neb. Rev. Stat. § 28-105 (Cum. Supp. 2002). Therefore, Cook's sentence was within statutory limits, and it will not be overturned on appeal unless Cook demonstrates an abuse of discretion.

Cook argues that his sentence was unduly influenced by an unsupported recommendation in the presentence investigation report. Without conducting any objective analytical tests of Cook, the probation officer concluded that Cook "could almost be considered a sociopath." The probation officer stated that Cook was a very dangerous individual and that he should be given the maximum 50-year sentence on the weapons charge. Cook argues that the probation officer's conclusions were unsupported by fact and that a determination that one is a sociopath or is dangerous should be based on more involved testing than was given Cook.

Cook also notes his lack of a criminal history, evidence that he was gainfully employed and supported Jeanette and his child, and evidence that he was drunk and possibly under the influence of other drugs at the time of the killing as factors which should have favored a more lenient sentence. Cook argues the court blindly accepted the probation officer's recommendation and imposed the maximum sentence. Cook further argues that the sentence on the weapons charge was excessive when compared to other cases in which a defendant was given a life sentence on a first degree murder charge and was also sentenced on a related weapons charge.

We find no abuse of discretion in the district court's sentencing. The court was able to make its own conclusions regarding Cook's dangerousness based on the evidence it saw and heard at trial, including Cook's own testimony. Cook does not demonstrate that the court's sentencing determination was unduly influenced by the opinions of the probation officer. Although the sentence was at the top of the range, considering the evidence and the nature of the killing in this case, we cannot say that the sentence was the result of an abuse of discretion. We therefore reject Cook's sixth assignment of error.

### 7. INEFFECTIVE ASSISTANCE OF COUNSEL

As his seventh assignment of error, Cook asserts that he received ineffective assistance of counsel at trial and that his

counsel's deficient performance prejudiced his defense. Cook specifies the following instances of ineffective assistance of counsel:

> defense counsel's failure to object to testimony by Amy Hoffmeyer and Michelle Childs, counsel's inquiry regarding Cook's alleged prior violence toward women, counsel's failure to request limiting jury instructions, counsel's failure to object to an expert opinion regarding probable cause, failure to request a continuance regarding late-disclosed scientific evidence, and failure to object to certain conclusions and recommendations in the presentence investigation report.

To establish a right to relief because of a claim of ineffective counsel at trial or on direct appeal, the defendant has the burden first to show that counsel's performance was deficient; that is, counsel's performance did not equal that of a lawyer with ordinary training and skill in criminal law in the area. The defendant must also show that counsel's deficient performance prejudiced the defense in his or her case. *State v. Leibhart, ante* p. 133, 662 N.W.2d 618 (2003). To prove prejudice, the defendant must show that there is a reasonable probability that but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome. *Id.* When a defendant challenges a conviction, the question is whether there is a reasonable probability that absent the errors, the fact finder would have had a reasonable doubt concerning guilt. *Id.*

A claim of ineffective assistance of counsel need not be dismissed merely because it is made on direct appeal. *Id.* The determining factor is whether the record is sufficient to adequately review the question. *Id.* The U.S. Supreme Court has recently observed that there may be instances where trial counsel's ineffectiveness is so apparent from the record or the deficiencies are sufficiently obvious that ineffective assistance of counsel claims are suited to resolution on direct appeal. *Massaro v. United States*, 538 U.S. 500, 123 S. Ct. 1690, 155 L. Ed. 2d 714 (2003). The U.S. Supreme Court has also noted:

> Under *Strickland v. Washington*, 466 U.S. 668 (1984), a defendant claiming ineffective counsel must show that counsel's actions were not supported by a reasonable

strategy and that the error was prejudicial. The evidence introduced at trial, however, will be devoted to issues of guilt or innocence, and the resulting record in many cases will not disclose the facts necessary to decide either prong of the *Strickland* analysis. If the alleged error is one of commission, the record may reflect the action taken by counsel but not the reasons for it. The appellate court may have no way of knowing whether a seemingly unusual or misguided action by counsel had a sound strategic motive or was taken because the counsel's alternatives were even worse.

*Massaro*, 538 U.S. at 505. In this regard, we have observed that if the matter has not been raised or ruled on at the trial level and requires an evidentiary hearing, an appellate court will not address the matter on direct appeal. *State v. Leibhart, supra.*

With respect to the numerous assignments of error involving claims of ineffective assistance of trial counsel, Cook emphasized at oral argument trial counsel's failure to object to certain testimony by Childs, who testified for the State shortly after Hornbacher. Without objection by defense counsel, Childs testified that the day following Stahlecker's killing, Hornbacher told her that Cook stated that he had had consensual sex with a woman and admitted to killing her. Cook argues that Childs' testimony regarding what Hornbacher told her was inadmissible hearsay and that as a result, defense counsel was ineffective for failing to object to such testimony. The State concedes that Childs' testimony was hearsay but argues that there was no prejudice to Cook because Childs' testimony was merely cumulative of Hornbacher's testimony regarding Cook's admission to the killing.

On the present record, we cannot say that failure to object to the testimony necessarily constituted deficient performance on the part of trial counsel. It is conceivable that trial counsel allowed Childs to testify without objection in order to emphasize the portion of her testimony in which Cook is said to have engaged in consensual sex in an effort to negate the underlying felony of first degree sexual assault with respect to the charge of felony murder. This approach would have been consistent with trial counsel's motion for directed verdict as to felony murder

based on Cook's claim that evidence of the underlying felony was insufficient to submit felony murder to the jury, an argument we have rejected *supra*. Trial counsel may have had other strategic reasons not apparent on this record such as the expectation of exploiting inconsistencies between Hornbacher's and Childs' testimony. The record in this direct appeal is not adequate for us to make a determination regarding the strategy employed by trial counsel or whether trial counsel was ineffective. We therefore make no determination with respect to this claim.

After reviewing each of Cook's other allegations of ineffective counsel, we conclude that the record on appeal is not adequate for this court to determine that counsel's assistance was ineffective. For each argument advanced by Cook, we find either that Cook has not provided sufficient evidence to establish that counsel's performance was deficient or that resolution of the argument requires an assessment of defense counsel's trial strategy, which requires an evaluation of matters outside the record before us on direct appeal. We therefore conclude that the record on direct appeal is not sufficient to adequately review these arguments, and because these matters have not been raised or ruled on at the trial level and may require an evidentiary hearing, we will not address these matters on direct appeal. See *State v. Leibhart, ante* p. 133, 662 N.W.2d 618 (2003).

### 8. MOTIONS FOR MISTRIAL AND FOR NEW TRIAL

As his eighth and final assignment of error, Cook asserts that the "many and varied" evidentiary errors in this case combined with the deficient performance of defense counsel created an inherently defective trial. Brief for appellant at 62. Cook argues that because of these deficiencies, the district court erred in overruling his motions for mistrial and for new trial. Cook provides little argument beyond the above assertions and does not specify what errors required the granting of mistrial or new trial.

The decision whether to grant a motion for mistrial is within the discretion of the trial court and will not be disturbed on appeal in the absence of an abuse of discretion. *State v. Aguilar,* 264 Neb. 899, 652 N.W.2d 894 (2002). Because we have found no merit in Cook's other assignments of error and the record on appeal does not allow us to determine whether Cook received

ineffective assistance of counsel, we do not find that Cook has established that his trial was inherently defective. We therefore find no merit in Cook's final assignment of error and conclude that the district court did not err in overruling Cook's motions for mistrial and for new trial.

## VI. CONCLUSION

We conclude that each of Cook's assignments of error is either without merit or not susceptible to review on direct appeal. We therefore affirm Cook's convictions and sentences.

AFFIRMED.