STATE OF NEBRASKA, APPELLEE, V.
DANIEL T. KUTA, APPELLANT.
686 N.W.2d 374

Filed September 14, 2004. No. A-03-1275.

Kirk E. Naylor, Jr., and Kevin Oursland for appellant.

Jon Bruning, Attorney General, and Kevin J. Slimp for appellee.

INBODY, MOORE, and CASSEL, Judges.

CASSEL, Judge.

## INTRODUCTION

Following a bench trial, the district court adjudged Daniel T. Kuta guilty and sentenced Kuta on two convictions of delivery of a controlled substance. Because we find that the State corroborated the testimony of the cooperating individual and presented sufficient evidence, we affirm.

## BACKGROUND

Thomas Hayes, an investigator with the Nebraska State Patrol, obtained cooperation from Lindsay Wegner after Hayes acquired evidence that Wegner had sold marijuana. To avoid prosecution, Wegner agreed to assist in making purchases of illegal drugs from two individuals, one of whom was Kuta. Wegner claimed to have previously been acquainted with Kuta.

On August 13, 2002, Wegner told Hayes that Kuta had notified her he had drugs available and that Wegner and Kuta had agreed to meet at Kuta's apartment in David City the following day. On August 14, Wegner met Hayes at the David City airport, where Hayes gave Wegner $120 to purchase controlled substances from Kuta. Prior to Wegner's going to Kuta's apartment, Glayda Scofield, a secretary with the David City Police Department, performed a search of Wegner's body and clothing for controlled substances. Scofield was not a police officer and had no formal training in conducting such searches, but she had previously performed searches of other female persons under the direction of law enforcement officers. Scofield understood that methamphetamine typically was distributed in small, rock-like portions. Scofield took Wegner into a private room and patted down

Wegner's outer clothing before having Wegner remove her outer clothing and then patting Wegner down around her bra and crotch regions. Scofield also checked Wegner's hair and feet and behind Wegner's ears. Scofield found no controlled substances.

Hayes and Stephen Sunday, the police chief of David City, searched Wegner's vehicle. They equipped Wegner with a wireless transmitter, which was placed in her pocket, prior to the meeting with Kuta. Sunday had previously verified Kuta's occupancy of the apartment by checking the city's utility records and by talking to Kuta's landlord.

Wegner then drove her vehicle to Kuta's apartment in David City. Hayes and Sunday followed in a separate vehicle, maintaining visual contact with Wegner. Kuta met Wegner in the parking lot of Kuta's apartment building. Hayes previously knew Kuta and was familiar with his vehicle from previous intelligence. Sunday had known Kuta since December 2000. Hayes and Sunday observed Wegner make contact with Kuta and observed as they walked up to the entrance to Kuta's apartment. Kuta and Wegner entered the apartment together. Hayes and Sunday lost visual contact with Wegner and Kuta at that point but monitored their conversation via Wegner's transmitter. At trial, Wegner testified that no one other than she and Kuta was present in the apartment. Hayes and Sunday testified that they recognized the voices of Kuta and Wegner transmitted by the wireless device and that they heard no other voices except as discussed below.

Wegner testified that after she and Kuta entered the apartment, she gave Kuta $120 in exchange for a quantity of methamphetamine. No law enforcement officers were present in the apartment at the time of the transaction. After Hayes and Sunday had heard conversation indicating that the transaction had been made, a former wife of Kuta's approached the apartment from the outside. She went to the door of the apartment and, remaining outside under Hayes' and Sunday's visual surveillance, briefly quarreled verbally with Kuta and then left the premises. Wegner then left the apartment and, followed by Hayes and Sunday, who again maintained constant visual contact with her, drove back to the David City airport, where she delivered the methamphetamine to Hayes. Wegner and her vehicle were again searched. No other controlled substances were found.

A similar transaction was arranged on August 22, 2002, after Kuta and Wegner spoke on the telephone. On this occasion, Wegner arranged to purchase an ounce of marijuana for $120. Again, Wegner informed Hayes and met with Hayes and Sunday prior to going to Kuta's apartment. Wegner and her vehicle were searched prior to the transaction. On that occasion, Patricia Lostroh, the director of the "Butler/Polk County Victim Assistance Unit," performed the pat-down search of Wegner. Although Lostroh was not a police officer, she had previously assisted law enforcement officers in searching female individuals as part of her employment. Lostroh's training to conduct searches came from the local police department and state troopers who had instructed Lostroh on the occasions on which she had assisted them.

Lostroh searched Wegner in a private area of the police department office in David City. Lostroh directed Wegner to take off her shoes, and she inspected Wegner's feet. Lostroh then felt up and down Wegner's legs, first on the outside and then on the inside, between Wegner's legs. Lostroh then felt around Wegner's waistband and inside of the waistband and felt under Wegner's shirt and inside of her bra. Lostroh also felt around Wegner's neck and hair. Lostroh told Wegner to open her mouth, and Lostroh looked in Wegner's mouth. Lostroh touched all of the areas Wegner's jeans covered, including her crotch and pockets, pressing hard enough on Wegner's jeans that she would have felt any concealed substances. Lostroh did the same thing "on top," checking "her back, her front, her breasts, the whole bit." No controlled substances were found. Hayes and Sunday again searched Wegner's vehicle before the transaction. Wegner was again equipped with a wireless transmitter and given $120 with which to make the arranged purchase.

Wegner then drove directly to Kuta's apartment, observed by Hayes and Sunday. Once Wegner arrived at Kuta's apartment, Kuta met Wegner at the doorway and Wegner joined Kuta inside. At this point, Hayes and Sunday lost visual contact with Kuta and Wegner but maintained audio surveillance via the wireless transmitter. They recognized the only voices as those of Kuta and Wegner. Wegner gave Kuta the $120, and Kuta briefly left the apartment and shortly returned with the marijuana, which Kuta then gave to Wegner. Hayes and Sunday had watched Kuta leave

through the door to the apartment and start down the steps, losing sight of Kuta at that point until he returned to the stairway shortly thereafter and reentered the apartment. Wegner then returned to her car and proceeded to drive to meet Hayes, Sunday, and Lostroh.

While in the process of exiting the parking lot, Wegner spoke briefly with another woman as both sat in their respective vehicles. Wegner was not close enough to hand anything to or receive anything from the other woman and did not exchange anything with her.

Upon meeting Hayes, Wegner turned over the marijuana. Lostroh again searched Wegner's person, and Hayes and Sunday searched Wegner's automobile. Again, no contraband was found.

The State filed an information charging Kuta with two counts of delivery of a controlled substance. Counts I and II alleged the events of August 14 and 22, 2002, respectively. Kuta pled not guilty and subsequently waived a jury trial. The court conducted a bench trial on September 25, 2003. After deliberation at the conclusion of the trial, the district court adjudged Kuta guilty on both counts. Prior to sentencing, the court conducted an enhancement hearing upon the State's allegation that Kuta was a habitual criminal. The court found that the State had proved that Kuta was a habitual criminal. The court then proceeded to conduct a sentencing hearing and sentenced Kuta on each conviction. Kuta timely appeals.

## ASSIGNMENTS OF ERROR

Kuta claims that the trial court erred (1) in finding the corroboration required by Neb. Rev. Stat. § 28-1439.01 (Reissue 1995) and (2) in finding there to be sufficient evidence to convict Kuta.

## STANDARD OF REVIEW

While in a bench trial of a criminal case the court's findings have the effect of a verdict and will not be set aside unless clearly erroneous, an appellate court has an obligation to reach an independent, correct conclusion regarding questions of law. *State v. Keup*, 265 Neb. 96, 655 N.W.2d 25 (2003). In determining whether evidence is sufficient to sustain a conviction in a bench trial, an appellate court does not resolve conflicts in

evidence, pass on credibility of witnesses, evaluate explanations, or reweigh evidence presented, which are within a fact finder's province for disposition. *State v. Hansen*, 252 Neb. 489, 562 N.W.2d 840 (1997).

## ANALYSIS

*Corroboration.*

Kuta asserts that the trial court erred in determining that the testimony of Wegner, the cooperating witness, was corroborated as to material facts and circumstances. Section 28-1439.01 states: "No conviction for an offense punishable under any provision of the Uniform Controlled Substances Act shall be based solely upon the uncorroborated testimony of a cooperating individual." The State concedes that Wegner was a cooperating individual. Kuta asserts that the State must provide corroboration as to the principal fact in issue: whether Kuta sold Wegner methamphetamine on August 14 and marijuana on August 22, 2002. However, as Kuta's brief acknowledges, the Nebraska Supreme Court has held that corroboration is sufficient, for the purpose of § 28-1439.01, if the witness is corroborated as to material facts and circumstances which tend to support the testimony as to the principal fact in issue. *State v. Goodro*, 251 Neb. 311, 556 N.W.2d 630 (1996) (citing *State v. Jimenez*, 248 Neb. 255, 533 N.W.2d 913 (1995)). The testimony of a cooperating individual need not be corroborated on every element of a crime. *State v. Kramer*, 238 Neb. 252, 469 N.W.2d 785 (1991).

Kuta argues that the facts of *Jimenez* are similar to those established in the instant case. However, the State responds, and we agree, that there is substantially more corroboration in the present case than in *Jimenez*. Here, the evidence shows that Hayes and Sunday independently verified where Kuta lived, that both officers knew Kuta, that they visually observed Kuta before and after the August 14, 2002, event, that they visually observed Kuta before the August 22 event, that they identified Kuta's and Wegner's voices as the only voices heard while they were monitoring the audio transmissions during the transactions, that they observed Kuta leave and return during the second transaction, and that their observations verified and supported Wegner's statements regarding what had occurred.

Kuta acknowledges that in *State v. Johnson*, 261 Neb. 1001, 627 N.W.2d 753 (2001), the Nebraska Supreme Court recognized that corroboration may be supplied by observation that a meeting between the subject and a cooperating individual actually took place, coupled with searches of the cooperating individual both before and within a reasonable time after a drug purchase took place. Kuta argues that because Scofield and Lostroh did not conduct body cavity searches of Wegner, the searches that they performed failed to meet the requirements for corroboration. While the Nebraska appellate courts have not directly described the scope of search required, other states have rejected similar contentions.

In *Hawkins v. State*, 626 N.E.2d 436 (Ind. 1993), the Indiana Supreme Court rejected the defendant's contention that because the police failed to perform a body cavity search of the informant prior to the controlled buy, the police officer who testified lacked sufficient personal knowledge that the informant did not possess any drugs before entering the house where the buy occurred. Similarly, in *State v. Johnson*, 665 So. 2d 1237 (La. App. 1995), the Louisiana Court of Appeal rejected the defendant's contention that a strip search of the confidential informant was required and found that where the evidence showed the police officer patted the informant down, turned his pockets inside out, took his shoes off, and patted down his socks, the search was sufficient to determine whether the informant had drugs, weapons, or money. This court agrees that such cases stand for the proposition that only a reasonable search is required. The extent of the searches conducted by Scofield and Lostroh described above was reasonable under the circumstances and sufficient to determine that Wegner had no drugs, weapons, or money.

Kuta further argues that searches of a cooperating individual by "untrained citizen[s]" such as Scofield and Lostroh are not sufficient to meet the requirements for corroboration. Brief for appellant at 12. Citing *State v. Johnson*, 261 Neb. 1001, 627 N.W.2d 753 (2001); *State v. Goodro*, 251 Neb. 311, 556 N.W.2d 630 (1996); *State v. Kramer*, 238 Neb. 252, 469 N.W.2d 785 (1991); and *State v. Knoefler*, 227 Neb. 410, 418 N.W.2d 217 (1988), he asserts that Nebraska's appellate courts have recognized the adequacy of searches for the purpose of corroboration only when

police officers conducted the searches of the cooperating individuals. Kuta cites cases wherein police officers performed the searches, but neither those cases nor any other Nebraska cases set forth a requirement that police officers be the ones to search the cooperating individual in order to meet the requirements for corroboration. Nebraska courts have long acknowledged the validity of searches by citizens acting as the agents of law enforcement, as long as those searches fall within the parameters of the U.S. and Nebraska Constitutions. See, e.g., *State v. Abdouch*, 230 Neb. 929, 434 N.W.2d 317 (1989). In this case, both Scofield and Lostroh were provided with some training by local law enforcement officials. They searched Wegner in their capacity as agents of law enforcement. The sufficiency of their searches constituted questions of fact. We cannot say that the trial court was clearly wrong in relying upon their searches.

We conclude that the searches performed by Scofield and Lostroh, considered together with the other circumstances presented by the evidence, were valid to establish corroboration. Hence, we conclude that the State presented sufficient evidence to corroborate the testimony of Wegner and that this assignment of error lacks merit.

*Sufficiency of Evidence.*

Kuta also assigns that the trial court erred in determining that the evidence was sufficient to establish Kuta's guilt beyond a reasonable doubt. Regardless of whether the evidence is direct, circumstantial, or a combination thereof, and regardless of whether the issue is labeled as a failure to direct a verdict, insufficiency of the evidence, or failure to prove a prima facie case, the standard is the same: In reviewing a criminal conviction, an appellate court does not resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh the evidence; such matters are for the finder of fact, and a conviction will be affirmed, in the absence of prejudicial error, if the evidence admitted at trial, viewed and construed most favorably to the State, is sufficient to support the conviction. *State v. Cook*, 266 Neb. 465, 667 N.W.2d 201 (2003). The relevant question for an appellate court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the

essential elements of the crime beyond a reasonable doubt. *State v. Hubbard*, 267 Neb. 316, 673 N.W.2d 567 (2004).

Kuta's argument on this issue is intertwined with his contention, which we have already rejected, that the State failed to adduce evidence to corroborate the testimony of Wegner. The testimony of Hayes and Sunday clearly establishes that Kuta was present with Wegner during the controlled buys. While Hayes and Sunday were not physically present when the specific transactions occurred, they were listening to the conversations transmitted by the wireless device Wegner carried. On both occasions, Hayes and Sunday identified the voices transmitted by the wireless device as those of Kuta and Wegner. Although Kuta's former wife approached the residence during the August 14, 2002, events and was heard over the transmitter, Sunday testified that she did not enter the apartment and never left Sunday's sight. Viewed most favorably to the State, the testimony of Wegner and the other corroborating evidence are sufficient to support the convictions.

## CONCLUSION
Because the evidence adduced by the State sufficiently corroborates the testimony of Wegner and is sufficient to support the convictions, we affirm the judgment of the district court.

AFFIRMED.